COMMONWEALTH *vs.* SINY VAN TRAN
(and thirteen companion cases[1]).

Suffolk. February 11, 2011. - September 14, 2011.

Present: SPINA, CORDY, BOTSFORD, GANTS, & DUFFLY, JJ.

*Practice, Criminal,* Trial of defendants together, Severance, Confrontation of witnesses, Argument by prosecutor, Voluntariness of statement, Delay in commencement of prosecution, Arraignment, Capital case. *Evidence,* Hearsay, Business record, Authentication of document, Cross-examination, Testimonial statement, Consciousness of guilt, Flight, Admissions and confessions. *Constitutional Law,* Confrontation of witnesses, Admissions and confessions, Waiver of constitutional rights. *Waiver. Due Process of Law,* Delay in commencement of prosecution. *Homicide.*

At a murder trial, the judge did not abuse his discretion in denying a codefendant's motion to sever, where the defenses at trial were not mutually antagonistic and irreconcilable, and where one defendant's allegation that a witness's inconsistent statement created a level of mutual antagonism warranting reversal was unconvincing. [541-543]

At a murder trial, the judge properly admitted certain airline records listing the defendants' names as passengers on flights leaving the country three weeks after the killings, where a jury could rationally have concluded, applying a preponderance of the evidence standard, that the documents were authentic [543-547]; further, the documents met the statutory predicates for admission under the business records exception to the hearsay rule, G. L. c. 233, § 78, and given that the judge properly instructed that the records were admitted not as proof of the defendants' actual identities as the passengers listed on the records, but simply for the purpose of showing that airline employees accurately recorded the passenger names as supplied to them, there was no merit to the defendants' assertions that the documents contained inadmissible "totem pole" hearsay [547-551]; finally, the three-week nexus between the murders and the flight plainly justified the judge's consciousness of guilt instruction [552-554].

At a murder trial, the admission of airlines records under the business records exception to the hearsay rule, G. L. c. 233, § 78, did not violate the defendants' constitutional right to confrontation, given that the records were created for the administration of the airline's affairs and not in anticipation of use at trial. [551-552]

At a murder trial, the prosecutor, during his opening statement, permissibly attempted to illustrate the magnitude of the crime, and did not attempt to vouch for the credibility of a witness. [554-555]

[1]Six against Siny Van Tran and seven against Nam The Tham (Tham).

At a criminal trial, no substantial likelihood of a miscarriage of justice arose from the prosecutor's statements, during his closing, arguing from the evidence why a witness should be believed [555-556]; further, the judge's sound instructions cured whatever prejudice, if any, that arose as a result of the prosecutor's statement ascribing an unsubstantiated state of mind to a witness [556].

A Superior Court judge, in denying a criminal defendant's motion to suppress an inculpatory statement that he made to police more than six hours after his arrest but before arraignment, correctly concluded that the defendant's Miranda waiver was voluntary and intelligent and that the defendant's statement was a free and voluntary act [556-559]; further, although the judge erred in concluding that the defendant's intelligent waiver of his Miranda rights effectively operated as a waiver of his right to a prompt arraignment, the admission of the defendant's statement did not constitute prejudicial error, where the circumstances were sufficiently exceptional (i.e., the defendant was interrogated the morning after an unusually long sequence of international travel, and his statement to police was concluded likely within six hours of waking) to toll the running of the six-hour safe-harbor period [560-563].

INDICTMENTS found and returned in the Superior Court Department on June 29, 1999.

Pretrial motions to suppress evidence were heard by *Patrick F. Brady*, J., and the cases were tried before *Stephen E. Neel*, J.

*Robert F. Shaw, Jr.*, for Nam The Tham.

*Janet H. Pumphrey* for Siny Van Tran.

*David D. McGowan*, Assistant District Attorney, for the Commonwealth.

CORDY, J. In the early morning hours of January 12, 1991, six men were shot execution-style in the basement of an illegal gambling parlor in the Chinatown section of Boston. Five of those men — Man Cheung, Van Tran,[2] Chung Wah Son, David Quang Lam, and Cuong Khand Luu — died from gunshot wounds to the head. A sixth man, Pak Wing Lee, survived and testified at the trial.

After the shootings, arrest warrants were issued for the defendants, Siny Van Tran (Tran) and Nam The Tham (Tham), but by that time they had already left the United States. In 1999, Tran was arrested in China. Tham was arrested the following year, also in China. A grand jury indicted both defendants in 1999,

---

[2]This victim will be referred to as Van Tran to avoid confusion with the defendant, Siny Van Tran (Tran).

and in December, 2001, they were extradited from Hong Kong. At a joint trial, the defendants were convicted on five charges of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty. Each defendant was sentenced to five consecutive terms of life imprisonment.[3] A third man alleged to have participated in the murders, Hung Tien Pham, has not been apprehended.

On appeal, the defendants assert several claims of error. Tran argues that the judge erred in denying their motions for severance where they presented mutually antagonistic defenses. Both defendants further contend that airline records that listed both of their names, and that of Hung Tien Pham, as ticketed passengers on a flight to Hong Kong departing three weeks after the murders, were improperly authenticated, constituted inadmissible hearsay, and provided an insufficient basis to justify the judge's consciousness of guilt instruction to the jury. They also argue that the prosecutor impermissibly vouched for the credibility of witnesses, argued facts that were not in evidence, and appealed to sympathy and emotion in his opening statement and closing summation. In addition, Tran argues that an inculpatory statement he made to Boston police detectives more than six hours after his arrest should have been suppressed because (1) he did not voluntarily and intelligently waive the constitutional rights afforded by *Miranda* v. *Arizona*, 384 U.S. 436 (1966); (2) his statement was not a free and voluntary act; and (3) he received a defective warning, through an interpreter, of his right to a prompt arraignment under *Commonwealth* v. *Rosario*, 422 Mass. 48 (1996).

For these reasons, the defendants request that we reverse their convictions and grant them new trials. We affirm the convictions, and decline to grant relief under G. L. c. 278, § 33E.

1. *The facts.* The jury could have found the following facts

---

[3]Each defendant was also convicted on one indictment charging armed assault with intent to murder, G. L. c. 265, § 18, and one indictment charging unlawful carrying of a firearm without a license, G. L. c. 269, § 10 (*a*). Both were sentenced to from nineteen and one-half to twenty years on the armed assault with intent to murder convictions, to be served on and after the fifth life sentence. They were also sentenced to from four and one-half to five years on the unlawful carrying of a firearm without a license convictions, to be served on and after the sentences imposed for armed assault with intent to murder.

based on the testimony of the survivor, Pak Wing Lee (Lee); the testimony of the proprietor of the gambling house, Yu Man Young (Young); and on other evidence adduced at trial. We recite certain facts as they become relevant to the issues raised.

In the basement of the building at 85 Tyler Street in Chinatown, Young ran what witnesses interchangeably called a "gambling house" or a "social club." There were card tables set out for men to play Mahjong, and Young provided tea and cigarettes. The gambling house was not open to the public, and an ornamental grate at the street level was kept locked at all times. There was a doorbell at the street level, and when it was rung, Young would view a closed-circuit video monitor trained on the front grate. If he recognized the person seeking entry, he or a doorman would allow him or her inside.[4]

At approximately midnight on January 12, 1991, Young arrived at the gambling house.[5] One of the victims, Chung Wah Son, was working as the doorman that evening. Three other victims, Cuong Khand Luu, Man Cheung, and Van Tran, were playing cards with two men, known only as "Ah B" and "Tong Dung."

At approximately 2 A.M., Lee arrived. He brought cash that he owed to Young's father for a gambling debt, and he stayed to gamble on a card game called "Cho Dai Dee," or "Chase the Deuce."[6] Approximately thirty minutes later, Tran entered the gambling house with the fifth victim, David Quang Lam. They had been drinking together at The Naked I nightclub. Soon after, Tran left by himself, returned to the gambling house again, and then left a second time.

Tran returned once more, this time with Tham and Hung Tien Pham. All three had guns. Tham carried a silver .38 caliber revolver, and Hung Tien Pham, a black .380 caliber semiauto-

---

[4]The surveillance system did not record.

[5]Yu Man Young (Young) was visited by Boston police investigators the day following the murders, and he falsely stated that he was not present in the gambling house the previous night. Shortly thereafter, he left Massachusetts and spent three months in Puerto Rico so police could not interview him. Subsequently, he failed to identify Tham in a photographic array. Counsel for Tran and Tham vigorously cross-examined Young concerning these and other issues pertaining to his credibility.

[6]Defense counsel suggested at trial that Pak Wing Lee (Lee) was a debt collector for Young's gambling outfit. Lee denied this, but admitted that two days prior to the shooting he had gone to Chen Kwong Market to collect a debt.

matic handgun.[7] Either Tran or Tham told everyone not to move and to kneel down.[8] Lee dropped to his knees, placed his hands behind his head, and bowed his head toward the ground. Cuong Khand Luu and Man Cheung knelt on the floor with their hands behind their heads. Van Tran remained seated and laid his head on the Mahjong table. Ah B hid under the table. David Quang Lam remained standing.

Young saw Tham shoot Chung Wah Son as soon as he opened the door. Lee saw Tham shoot Man Cheung, and then "did not dare to look" anymore. Hung Tien Pham shot Cuong Khand Luu multiple times in the head. Neither Lee nor Young saw who shot Van Tran or David Quang Lam, but when the sound of gunshots ceased, both lay dead.

At this point, Lee heard Young say, "Hung [Tien Pham], no, no. Doesn't matter how much money you want, I'll give it to you. If you want money, you want all, I give you all." Hung Tien Pham said, "I can spare your life."[9] Ah B was kneeling on the ground next to Lee also pleading for his life. Then, Lee felt Hung Tien Pham place a gun to the back of his head. Lee pleaded with him not to fire, but Lee heard a bang, and then nothing.

After Lee was shot, Tran, Tham, and Hung Tien Pham, along with Young and Ah B, left through the front entrance, and Young locked the front grate behind them. They all ran in different directions.

At approximately 4 A.M., Lee regained consciousness. He crawled out the back door of the gambling house and outside to a second locked grate, where he shouted for help. Harold "Bud" Farnsworth, a security guard at New England Medical Center, was on a break outside when a young couple told him a

---

[7] At trial, Lee testified that Tham was carrying the revolver, but in a pretrial statement to agents from the Federal Bureau of Investigation (FBI), he said that Tran carried the revolver.

[8] In personal notes that he made to assist his recollection, Lee wrote that Tran entered the gambling house first and ordered everyone to the floor. On direct examination, he stated that Tham entered first and made the order. On cross-examination, he said Tran entered first, and explained the Cantonese translator made an error. Lee told the grand jury that the three shooters said nothing as they entered. Young testified that Tran said, "Robbery," as they entered.

[9] Young denied negotiating for his life and explained that he was not shot because the shooters ran out of bullets.

man was lying on the ground across the street. Farnsworth ran across to the rear of the gambling house. Lee was leaning on the locked grate, moaning and bleeding from his head. Farnsworth flagged down a police vehicle and two police officers approached Lee, who could not speak but made a shooting gesture with his index finger and thumb. Farnsworth and the police officers pried open the locked rear grate with a tire iron, entered the gambling house, and saw "dead people all over the place." The victims all had been shot in the head.[10]

Money and playing cards had been left on the tables and were strewn about the floor. Some card tables were overturned. A cellular telephone was on the floor. A silver .38 caliber revolver was on one table. A black .380 caliber semiautomatic handgun was on the floor, underneath a table and behind a chair. Shell casings, projectiles, and live rounds of ammunition were all over the floor. A forensics expert with the Boston police department concluded that the .38 caliber revolver had been fired five times, while the .380 caliber semiautomatic handgun had been fired four times, and three live rounds had been manually ejected. However, some of the shell casings and projectiles collected in evidence did not match either the .38 caliber revolver or the .380 caliber semiautomatic handgun, meaning that a third unrecovered firearm had been used. Some of the bullet fragments taken from the bodies of the victims were fired from this third unrecovered firearm.

On December 21, 2001, the defendants were flown to San Francisco and transferred to the custody of Joseph Tamuleviz, a special agent with the United States Drug Enforcement Agency; Kevin Constantine, an agent with the Federal Bureau of Investigation (FBI); another FBI agent; and a United States marshal.

---

[10] Autopsies revealed that Man Cheung had been shot twice in the head, once at very close range. Van Tran was shot at "near contact" in the left side of his head. Chung Wah Son was shot twice in the head and once in his left hand. David Quang Lam was shot twice in the head and once in the chest. An examination of one of the head wounds indicated that the shooter held the gun barrel tightly to the side of his head. Cuong Khond Luu was shot twice in the head.

A criminalist, qualified as an expert in the field of gunshot residue analysis, examined the particle density of lead and copper deposits on the collars of jackets worn by Lee and Man Cheung in relation to the holes torn by the bullets. Her analysis showed that both men were shot at very close range.

The agents then transported the defendants to Boston with a layover in Washington, D.C. En route, Tamuleviz said that he told Tham: "[I]f he acted like a gentleman, I would treat him like a gentleman." Tamuleviz stated that Tham replied, in English: "I was there, they gave me a gun, but I didn't kill anybody."[11]

The next day, after arriving at Logan Airport and spending the night in a holding cell at a police station, Tran made a statement to Boston police detectives in which he explained, inter alia, that he arrived at the gambling house with David Quang Lam and left between 3 A.M. and 4 A.M. to look for cocaine. He said he had returned to the gambling house when Hung Tien Pham and another man came in and began shooting. He said he escaped by running outside and then took a bus to Atlantic City "to gamble and to have fun." Thereafter, he traveled to Philadelphia and from there flew to Hong Kong on a passport issued in the name of Wah Tran. Before his arrest, he was living in the Quangxi province of China.

2. *Severance*. Prior to trial, Tran filed a motion to sever.[12] He argued that he and Tham would present mutually antagonistic defenses at trial, which necessitated severance. See *Commonwealth* v. *Moran*, 387 Mass. 644, 657-659 (1982). The judge denied the motion, ruling that severance was not required, even

[11]On cross-examination, Joseph Tamuleviz admitted that although he filed a written report following the flight to Boston, he did not include any information about this inculpatory statement. Constantine testified that he did not hear the statement.

[12]Before trial, Tham also filed a motion to sever, arguing that severance was required under the constitutional principles espoused in *Bruton* v. *United States*, 391 U.S. 123, 135-136 (1968) (*Bruton*) (defendant deprived of right of confrontation where facially incriminating confession of nontestifying codefendant introduced at joint trial). Tham argued that a portion of Tran's statement to the Boston police to the effect that it "seem[ed]" to him like Tham was one of the shooters, along with Hung Tien Pham, was directly inculpatory of Tham, and justified severance under *Bruton*. The judge agreed, and ordered redaction of Tran's statement to omit all references to Tham's presence at the gambling house. *Gray* v. *Maryland*, 523 U.S. 185, 192 (1998) ("Unless the prosecutor wishes to hold separate trials . . . he must redact the confession to reduce significantly or to eliminate the special prejudice that the *Bruton* Court found"). Although not raised by Tham, we note, as did the motion judge, that the statement still contained references to the "gunmen," meaning Hung Tien Pham and another unidentified shooter. These stray references created, if at all, inculpatory inferences of such a remote nature that they did not fall within the scope of *Bruton*. Cf. *Commonwealth* v. *Blake*, 428 Mass. 57, 62 & n.7 (1998).

in the face of mutually antagonistic defenses, where the jury could discredit both defendants' theories of the case and, instead, credit eyewitness testimony and other evidence.

On appeal, Tran argues that substantial prejudice arose when Tham's counsel impeached Lee's statement (made during direct examination) that Tham had ordered the victims to the floor, with a pretrial statement in which Lee said that it was, in fact, Tran who gave the order. See note 8, *supra.* Tran's counsel renewed his motion to sever and argued then as he does now that this impeachment evidence would not have been elicited at a severed trial, and that its admission prevented Tran from receiving a fair trial. Tran further contends that these circumstances forced the defendants to pit one against the other, which impermissibly created a danger the jury would "unjustifiably infer from the conflicting defenses alone that both defendants are guilty." *Commonwealth* v. *Moran, supra* at 659.

When criminal charges against two or more individuals "arise out of the same criminal conduct," Mass. R. Crim. P. 9 (b), 378 Mass. 859 (1979), it is presumed that those individuals will be tried together. *Commonwealth* v. *Smith,* 418 Mass. 120, 125 (1994). "If it appears that a joinder . . . of defendants is not in the best interests of justice, the judge may . . . grant a severance of defendants, or provide whatever other relief justice may require." Mass. R. Crim. P. 9 (d), 378 Mass. 859 (1979). A judge should sever trials if a defendant meets the burden of proving that (1) the defenses are "antagonistic to the point of being mutually exclusive," *Commonwealth* v. *Bienvenu,* 63 Mass. App. Ct. 632, 637 (2005), quoting *Commonwealth* v. *Suarez,* 59 Mass. App. Ct. 111, 118 (2003). See *Commonwealth* v. *Moran, supra* at 657-658; or (2) "the prejudice resulting from a joint trial is so compelling that it prevents a defendant from obtaining a fair trial." *Id.* at 658.

With regard to the former, defenses are mutually antagonistic and irreconcilable where the "sole defense of each [is] the guilt of the other." *Commonwealth* v. *Stewart,* 450 Mass. 25, 31 (2007), quoting *Commonwealth* v. *Moran, supra* at 656. Severance is not required where the defendants merely assert inconsistent trial strategies. See *United States* v. *Ziperstein,* 601 F.2d 281, 285 (7th Cir. 1979), cert. denied, 444 U.S. 1031 (1980)

(" 'mutual antagonism' only exists where the acceptance of one party's defense will preclude the acquittal of the other"). Even if mutually antagonistic, "there is no compelling prejudice and therefore no requirement of severance where the jury were warranted in finding [the defendant] guilty . . . on the basis of . . . eyewitness testimony [and other evidence]." *Commonwealth* v. *Stewart, supra,* quoting *Commonwealth* v. *Cordeiro,* 401 Mass. 843, 853 (1988). Absent a constitutional requirement, severance is a matter "committed to the sound discretion of the trial judge." *Commonwealth* v. *McAfee,* 430 Mass. 483, 485 (1999).

Here, there was no abuse of discretion in the denial of the motions to sever. The defenses at trial were not mutually antagonistic and irreconcilable. Neither defendant presented a "sole defense" based on the guilt of the other, as was the ineluctable defense of last resort pressed by the codefendant in *Commonwealth* v. *Moran, supra* at 652, 659-660 (evidence that one defendant, not necessarily both, robbed and killed victim). Indeed, in important respects, Tran and Tham's defenses were entirely consistent. Each pointed to evidence linking Hung Tien Pham to the killings, and each vigorously impugned the percipient witness, Young, suggesting both his involvement in the crime and motive to lie. Tran also implied that Lee harbored a motive to fabricate his testimony because Tran had once publicly humiliated him for cheating at cards. Each defendant further asserted a defense of inadequate police investigation under *Commonwealth* v. *Bowden,* 379 Mass. 472 (1980).

Tran's argument on appeal that Lee's inconsistent statement created a level of mutual antagonism warranting reversal is unconvincing. The inconsistency centered on whether Tham or Tran assumed a leadership role by entering the gambling house first. This inconsistency created no inference of mutual exclusion, i.e., that either Tham *or* Tran was involved in the killings, but not both, as required by *Commonwealth* v. *Moran, supra* at 657-659, and its progeny. There was ample evidence to support a theory of joint venture. Lee's testimony on direct examination merely caused the defendants to take inconsistent positions on a subsidiary and marginally relevant issue of fact.[13]

3. *Admission of airline records.* At trial, two airline documents

---

[13]Even if the defendants had presented mutually antagonistic defenses,

were admitted in evidence to reflect that ticketed passengers flying under the names Wah Tran (the name on the passport belonging to Siny Van Tran), Nam The Tham, and Hung Tien Pham boarded a flight from John F. Kennedy Airport in New York City to Norita, Japan, and continuing to Hong Kong on February 1, 1991 — less than three weeks after the murders. The Commonwealth offered the documents under the business records statute, G. L. c. 233, § 78, as circumstantial evidence of the defendants' consciousness of guilt.

One of these documents was a photocopy of a one-page portion of a United Airlines passenger manifest for flight 801 departing from New York City to Norita. A passenger manifest is a report that lists all passengers on a given flight and their corresponding seat numbers. It is created for the pilot and flight crew just prior to takeoff. The manifest lists "Tran/Wah Mr." in seat 53F and "Tham/Nam The Mr." in seat 46J, with both passengers ticketed for connecting flight 831 to Hong Kong. An identical "group code" appears next to both of their names, denominating that they purchased tickets together and were traveling in the same party. A passenger under the name "Pham/Hung Tien Mr." appears on the manifest assigned to seat 45H, also connecting to flight 831 bound for Hong Kong.

The second admitted document was a so-called "ticket inquiry," which lists a variety of information associated with any ticket purchased for a United Airlines flight. The ticket inquiry identified three tickets under the names "Tham/Nam The Mr.," "Tran/Wah Mr.," and "Pham/Hung Tien Mr.," all sold on January 30, 1991, with consecutive ticket identification numbers, meaning that the airline issued them one after the other.[14] The defendants contend that neither document should have been

which they did not, "no compelling prejudice" arose where the jury could rationally find each of the defendants guilty "on the basis of . . . eyewitness testimony [and other evidence]." *Commonwealth* v. *Stewart*, 450 Mass. 25, 31 (2007), quoting *Commonwealth* v. *Cordeiro*, 401 Mass. 843, 853 (1998). Given the testimony of Lee and Young that both defendants entered the gambling house with guns drawn, and the ballistics evidence showing that three guns were fired, the jury could easily rely on evidence other than the inculpatory suggestions of one defendant against the other. See *Commonwealth* v. *Stewart, supra.*

[14]The tickets issued to Tham and Tran were for flight 801 on January 31, 1991, continuing to Hong Kong, with an "open" return ticket, meaning the

admitted because they were not properly authenticated and contained inadmissible "totem pole" hearsay. They also contend that the admission of the documents violated their constitutional right of confrontation.

a. *Authentication.*[15] An employee at United Airlines provided the passenger manifest and ticket inquiry to Boston police detectives on February 21, 1991. The documents were admitted through the testimony of David Contarino, the business manager of United Airlines in Boston. Contarino was "[s]econd in charge" of the airline's financial operations at Logan Airport at the time of trial. He had worked at United Airlines since 1999, when he started as a "gate agent," processing tickets for passengers boarding outbound flights.

He testified that based on his experience, he knew that the passenger manifests for all flights were created by computer software called "Apollo," which is managed by a third-party vendor but designed exclusively for United Airlines. The appearance of the manifest, other than slight variations in font type, and the data it contained were identical to the passenger manifests produced by the "Apollo" software used by United Airlines throughout his employment there. Specifically, he recognized the passenger manifest to be authentic based on certain coding data, such as the unique "016" designator number used to signify United Airlines as the carrier of flight 801; the designation "M" next to some passenger names, which United Airlines still internally used to identify passengers booking tickets under a "frequent flyer" number; and meal code abbreviations, such as "KSML" indicating that a passenger requested a kosher meal. He testified that flight 801 was still the designation for United Airline's international route from John F. Kennedy airport to Norita, Japan.

Contarino also testified that based on his experience, he knew ticket inquiries to be stored in an electronic database in an "old

date was not set. The ticket inquiry further showed that these tickets had not been used on January 31, but rather on flight 801 on the following evening, February 1, 1991. The ticket issued to Hung Tien Pham was also for flight 801 connecting to Hong Kong on February 1, 1991. It too was booked with an "open" return. The ticket was collected at the gate.

[15]Authentication is an issue separate from the question whether the documents qualify as admissible business records under G. L. c. 233, § 78. We discuss the business record issue in part 3(b), *infra*.

fashioned mainframe computer" in Elk Grove Village, Illinois. The ticket inquiries corresponding to the names Tran, Tham, and Hung Tien Pham for flight 801 contained some of the same unique codes as the passenger manifest and were nearly identical in appearance to ticket inquiries used by United Airlines at the time of trial. Contarino testified that he had examined hundreds of passenger manifests and ticket inquiries.

The defendants argue that Contarino did not lay an adequate foundation to authenticate the photocopied airline documents, and thus, it was error for the judge to admit them. They note that Contarino started working at United Airlines more than eight years after the passenger manifest and ticket inquiries were produced, and they contend that the law does not permit authentication of documentary evidence where the foundation offered is that, in form alone, the document is similar in appearance to records with which the witness expressed familiarity. See *Commonwealth* v. *LaCorte*, 373 Mass. 700, 704 (1977). The documents were not originals, not produced by the witness laying their foundation, and of unknown origin. In the case of the passenger manifest, only a partial reproduction of the complete document, which would have been approximately ten pages long, was provided.

The requirement of authentication as a condition precedent to admissibility of real evidence is satisfied by a foundation sufficient to support a finding that the item in question is what its proponent claims it to be. Mass. G. Evid. § 901(a) (2011). See *Commonwealth* v. *LaCorte, supra*; M.S. Brodin & M. Avery, Massachusetts Evidence § 9.2, at 580 (8th ed. 2007). See also Fed. R. Evid. § 901(a) (2010) (same). Evidence may be authenticated by circumstantial evidence alone, including its "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics." Mass. G. Evid., *supra* at § 901(b)(1), (4). Fed. R. Evid. § 901(b)(1), (4) (2010). A proponent adequately lays the foundation for admission when a preponderance of the evidence demonstrates that the item is authentic. See *Commonwealth* v. *LaCorte, supra*; *United States* v. *Safavian*, 435 F. Supp. 2d 36, 38 (D.D.C. 2006).

Here, the jury could rationally have concluded, applying a preponderance of the evidence standard, that the documents

were authentic. See *id.* Both the passenger manifest and the ticket inquiry displayed several distinctive internal codes used only by United Airlines. Contarino recognized both airline documents as nearly identical in appearance to those used by United Airlines at the time of trial. Moreover, Tran told police that he flew to Hong Kong in 1991 (after traveling to Atlantic City and Philadelphia) on a passport issued to Wah Tran, providing further circumstantial evidence of the authenticity of the documents. There was no error in the trial judge's ruling that the Commonwealth laid a proper foundation for their admission. See *id.*; Mass. G. Evid., *supra* at § 901(b)(1), (4).

b. *Business records exception.* Initially, the trial judge excluded the passenger manifest and ticket inquiry, ruling that, even if the documents qualified for the business records exception to the rule against hearsay, the entries of the defendants' names in those documents constituted second level or totem pole hearsay, see *Wingate* v. *Emery Air Freight Corp.*, 385 Mass. 402, 406 (1982) (*Wingate*), because the Commonwealth had not adduced evidence that United Airlines employees verified the identities of the persons purchasing the tickets or checking in for the flight.[16] As such, the judge concluded that the entry of the names in the passenger manifest and ticket inquiry carried no "indicia of reliability, arising from regularity and business motives," and, consequently, were inadmissible to prove that the defendants (and not imposters) reserved airline tickets, and actually traveled to Hong Kong. *Wingate, supra.*

After the judge's ruling, the Commonwealth sought emergency relief from a single justice of this court pursuant to G. L. c. 211, § 3. The single justice concluded that the ruling amounted to an error of law, and directed that the airline documents be admitted in evidence.[17]

On appeal, the defendants largely press the same argument

[16]Contarino testified that in early 1991, very much unlike today, it was not routine for gate agents or airport security officers to verify the identities of ticketed passengers.

[17]The single justice ruled that "[e]vidence may be admitted under the [business records] exception even if the information contained in the record originated with an outsider so long as the creator of the entry would normally have recorded such information as a matter of business duty or business routine."

made at trial: (1) that the names listed on the passenger manifest and ticket inquiry amount to hearsay because they are out-of-court statements offered to prove as true the assertions that the defendants were the persons who purchased the tickets and boarded the flight; and (2) that the documents should have been excluded from evidence because the hearsay statements of a third party contained in an otherwise admissible business record must be made by a person with a business duty to accurately and regularly report the information or, at least, must meet another independent exception to the hearsay rule. See *Beal Bank, SSB* v. *Eurich,* 444 Mass. 813, 815-816 (2005) (*Beal Bank*); *Wingate, supra*; *Commonwealth* v. *DeBrosky,* 363 Mass. 718, 724 (1973). That is, it was not only required that the employee preparing the United Airlines record was under a duty reliably to record the information provided by the airline passenger, but also that the passenger had a corresponding duty to provide a true identity.

General Laws c. 233, § 78, creates an exception to the rule prohibiting admission of hearsay evidence for official business records provided that (1) the entry, writing, or record was made in good faith; (2) in the regular course of business; (3) before the beginning of the civil or criminal proceeding in which it is offered; and (4) it was the regular course of such business to make such memorandum at the time of such act, transaction, occurrence, or event, or within a reasonable time thereafter.[18] G. L. c. 233, § 78. See *Commonwealth* v. *Trapp,* 396 Mass. 202, 208 (1985), *S.C.,* 423 Mass. 356, cert. denied, 519 U.S. 1045 (1996). Such records are "presumed to be reliable and therefore admissible because entries in these records are routinely made by those charged with the responsibility of making accurate entries and are relied on in the course of doing business." *Wingate, supra.* It is well established that the business records exception "should be interpreted liberally to permit the receipt of relevant evidence." *Wingate* v. *Emery Air Freight Corp.,* 11 Mass. App. Ct. 982, 983 (1981), *S.C.,* 385 Mass. 402 (1982).

"The statute makes clear that the record is admissible even when the preparer has relied on the statement of others, by

---

[18]In a criminal trial, the judge preliminarily must decide that these four factual conditions of admissibility have been satisfied, and then the questions of fact must be submitted to the jury. G. L. c. 233, § 78. They were properly submitted to the jury in this case.

providing that 'personal knowledge by the entrant or maker' is a matter affecting the weight (rather than the admissibility) of the record." *Wingate, supra*, quoting G. L. c. 233, § 78. See *Commonwealth* v. *Kiley*, 373 Mass. 454, 462 (1977); *Sawyer & Co.* v. *Southern Pac. Co.*, 354 Mass. 481, 484 (1968). "It does not follow, however, that the preparer may rely on statements that are not themselves a part of the regular course of business record-keeping." *Wingate, supra.* See Notes of Advisory Committee on Proposed Rules to Fed. R. Evid. 803, 28 U.S.C. app. 373 (2006) ("If . . . the supplier of the information does not act in the regular course, an essential link is broken; the assurance of accuracy does not extend to the information itself, and the fact that it may be recorded with scrupulous accuracy is of no avail"). "Although the preparer's hearsay sources must carry the same indicia of reliability and be shown to have been reported as a matter of business duty or business routine, this can be accomplished by presenting evidence of normal business practice, rather than by producing each speaker." *Beal Bank, supra* at 816, citing *Wingate, supra.*

As a threshold matter, the passenger manifest and ticket inquiry meet the statutory predicates for admission under the business records exception.[19] See G. L. c. 233, § 78. Whether the assertions they contain from the persons purchasing the tickets and boarding the airplanes, that is, the names they used, are inadmissible hearsay depends in part on whether those assertions are admitted for their truth or for some other nonhearsay purpose. If offered for their truth, their admissibility depends on whether they are sufficiently reliable either because there was a corresponding duty on the passengers to give accurate information, or for some other recognized reason. See *Beal Bank, supra*; *Wingate, supra.* Insofar as we conclude that the statements were

---

[19]Contarino testified that, as a matter of course, United Airlines employees create a passenger manifest for every flight immediately prior to departure, and input the ticket inquiry information contemporaneous with purchase. In each instance the information is obtained by the employee directly from the passenger, who provides the information himself either at the boarding gate or at the time the ticket is purchased. As to the passenger manifest, gate agents are required to produce the document for the pilot and flight crew to facilitate response to emergencies and passenger requests. As to the ticket inquiry, employees retrieve inquiries from the database for billing purposes and to comport with Federal Aviation Administration regulations.

not offered for their truth, we need not decide whether the circumstances in which they were made were sufficiently reliable to permit their consideration by the jury for that purpose.[20]

In his final instruction to the jury, the judge forbade them from considering "the documents as direct evidence[,] that either of the defendants . . . or Hung Tien Pham, were passengers on the flight indicated in the documents." Rather, the judge instructed the jury that they "may consider the documents only as circumstantial evidence that some person or persons if not either of the defendants themselves, or Mr. Pham, had used the defendants' names and the name of Mr. Pham when purchasing the tickets for the flight." With this limitation, and only in cumulation with other evidence, could the jury reach permissibly the conclusion that the defendants departed on that flight.[21]

The hearsay rule prohibits the admission only of out-of-court assertions offered to prove the truth of the matter asserted. Mass. G. Evid., *supra* at § 801(c), at 230. Accordingly, if a statement is not offered to prove the facts asserted in it but is offered only to show that the statement "was made," it is not hearsay and is admissible. *Commonwealth* v. *Sullivan*, 410 Mass. 521, 526 (1991) ("Because the statement was not offered to

[20]Other courts have concluded that information provided by passengers and recorded in the business records of airlines similar to those at issue here is sufficiently trustworthy for admission, even before the rigors of identification checks that followed the attacks of September 11, 2001. See, e.g., *United States* v. *Fujii*, 301 F.3d 535, 539 (7th Cir. 2002), quoting Fed. R. Evid. 803(6) ("check-in and reservation records were compiled and maintained in Korean Airlines' ordinary course of business" admissible because "the source of information or the method or circumstances of preparation indicate . . . trustworthiness"); *United States* v. *Elder*, 90 F.3d 1110, 1121 (6th Cir.), cert. denied sub nom. *Andrews* v. *United States*, 519 U.S. 1016 (1996), and cert. denied sub nom. *Elder* v. *United States*, 519 U.S. 1131 (1997) (Delta Airlines business records admissible demonstrating thirty-three round trips by defendant between Florida and Knoxville, Tennessee); United States *vs.* Marin, U.S. Ct. App., No. 95-1106 (2d Cir. Sept. 11, 1995) ("flight reservation record and a passenger manifest for the Viasa airlines flight" admitted through "employee of a firm that provides services to Viasa Airlines" admissible because documents bore "sufficient indicia of trustworthiness to be considered reliable").

[21]Such evidence could have included the defendants' mutual flight from the scene, their absence from the community for the years prior to trial as noted by witnesses, Tham's transport to Boston by Federal agents, and Tran's statement that Hung Tien Pham was still at large in Asia. With respect to Tran, the jury could also consider his admission to the police that he had flown to Hong Kong shortly after the murders on a passport in the name of Wah Tran.

prove the truth of the matter it asserted, but rather only for the fact that it was made, it was not hearsay"); *Commonwealth* v. *Serrano-Ortiz,* 53 Mass. App. Ct. 608, 614 (2002) ("Statements are not inadmissible hearsay when they are not offered to prove the truth of the matter asserted, but, rather, are offered for a purpose whose relevance flows simply from the fact that the statements were made"). The statements here, which the defendants paint as hearsay, are that of the purchasers of the airline tickets stating their names to a United Airlines sales agent, as memorialized on the tickets. The judge admitted the statements not as proof of the defendants' actual identities as the passengers listed on the flight documents, but simply for the purpose of showing that the statements were made by someone, even, perhaps, a person being untruthful, who held themselves out to be these men. See *Commonwealth* v. *Sullivan, supra*; *Commonwealth* v. *Serrano-Ortiz, supra.*

The admissibility of the records for this purpose is consistent with authority from other jurisdictions in parallel circumstances. See *United States* v. *Bell,* 833 F.2d 272, 276 (11th Cir. 1987) (admission of motel guest registration record, even without corroboration of identity by hotel employees, to show someone using listed name registered and checked in); *United States* v. *Lieberman,* 637 F.2d 95, 99-101 (2d Cir. 1980) (same). See also *Commonwealth* v. *DeBrosky,* 363 Mass. 718, 725 n.6 (1973) (registration record admitted because use of name was nonhearsay admission of party opponent). The judge concluded that the Commonwealth laid the foundation for admission of the records as required by G. L. c. 233, § 78. Having properly instructed the jury as to their use for the nonhearsay purpose of showing that airline employees accurately recorded the names that were provided by the suppliers of the information, he did not err. See *United States* v. *Bell, supra*; *United States* v. *Lieberman, supra.*

c. *Confrontation clause.* It is also argued on appeal that the admission of the passenger manifest and ticket inquiry violated the defendants' constitutional right to confrontation because there was no opportunity to cross-examine the United Airlines staffer who prepared the records.[22] See *Crawford* v. *Washington,* 541 U.S. 36, 51-52 (2004).

---

[22]The confrontation clause of the Sixth Amendment to the United States

The United States Supreme Court has held that the confrontation clause guarantees a defendant the opportunity to confront any person, in the "crucible of cross-examination," whose "testimonial" statements are introduced against him. *Id.* at 50-52, 61. It is the testimonial character of any item of evidence that triggers the confrontation right, notwithstanding its admissibility under statute, State rule, or a common-law hearsay exception. *Melendez-Diaz* v. *Massachusetts*, 129 S. Ct. 2527, 2539-2540 (2009). See *Commonwealth* v. *Gonsalves*, 445 Mass. 1, 14 (2005), cert. denied, 548 U.S. 926 (2006). At issue here are two business records. The Supreme Court has stated: "Business and public records are generally admissible absent confrontation . . . because — having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial — they are not testimonial." *Melendez-Diaz* v. *Massachusetts*, *supra* at 2539-2540. See *Commonwealth* v. *Zeininger*, 459 Mass. 775, 786-787 (2011). Contarino testified that the passenger manifest is created, as a matter of course, for the pilot and flight crew on every United Airlines flight, while the information produced on the ticket inquiries is stored in a company database to facilitate billing and to comply with Federal Aviation Administration regulations. Clearly, the two records are created "for the administration of an entity's affairs" and were not created in anticipation of use at trial. *Melendez-Diaz* v. *Massachusetts*, *supra* at 2539. See *Michigan* v. *Bryant*, 131 S. Ct. 1143, 1155 (2011) ("objective of the [c]onfrontation [c]lause" is to provide opportunity to cross-examine when statements "taken for use at trial"); *Melendez-Diaz* v. *Massachusetts*, *supra*. See *Commonwealth* v. *Zeininger*, *supra*. There was no constitutional violation.

d. *Consciousness of guilt.* The judge instructed the jury that "if the Commonwealth has proven" that the defendants fled to avoid arrest, the jury may infer that that flight "might tend to show actual guilt."[23] The defendants argue that, even if the passenger manifest and ticket inquiry were admissible, they provided

---

Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."

[23] The judge's instruction conformed with the model formulation articulated in *Commonwealth* v. *Toney*, 385 Mass. 575, 585-586 & n.6 (1982).

an insufficient evidentiary basis for the judge to issue this consciousness of guilt instruction, where there was no contextual evidence that the defendants had independent knowledge of an imminent arrest or were otherwise attempting to evade prosecution. See *Commonwealth* v. *Haraldstad*, 16 Mass. App. Ct. 565, 570 (1983).

"Flight is perhaps the classic evidence of consciousness of guilt." *Commonwealth* v. *Carrion*, 407 Mass. 263, 277 (1990). "Consciousness of guilt instructions are permissible when there is an 'inference of guilt that may be drawn from evidence of flight, concealment, or similar acts . . . .' " *Commonwealth* v. *Tu Trinh*, 458 Mass. 776, 780 (2011), quoting *Commonwealth* v. *Stuckich*, 450 Mass. 449, 453 (2008). We have said that a "temporal connection between the crime and evidence" suggesting that a defendant abandoned his "usual environs" justifies a consciousness of guilt instruction to the jury. *Commonwealth* v. *Tu Trinh*, *supra* at 780, 781 (consciousness of guilt instruction warranted where defendant abandoned apartment with belongings inside and was seen next at airport returning from Vietnam). See *Commonwealth* v. *Toney*, *supra* at 583. See also *Commonwealth* v. *Otsuki*, 411 Mass. 218, 237 (1991) (consciousness of guilt evidence admissible where defendant fled to Mexico, was arrested there, and was returned to United States by Federal authorities). It is not "necessary for the Commonwealth to prove that at the time of flight the accused knew of police pursuit, in order for evidence of flight to be admissible." *Commonwealth* v. *Toney*, *supra*. It is within the sound discretion of the trial judge whether or not to instruct the jury regarding the evaluation of consciousness of guilt evidence. *Commonwealth* v. *Brousseau*, 421 Mass. 647, 652 (1996).

Here, the three-week "temporal" nexus between the murders and the flight to Hong Kong plainly justified the consciousness of guilt instruction. See *Commonwealth* v. *Tu Trinh*, *supra*. There was evidence in the record, through the testimony of Lee and Young (and Tran's own statement to police), that both defendants had lived in Boston for years. There was no evidence proffered at trial explaining a different purpose for suddenly flying together to Hong Kong, or why tickets with no return date had been purchased in their names. See *Commonwealth* v. *Tu Trinh*,

*supra*; *Commonwealth* v. *Otsuki, supra*; *Commonwealth* v. *Toney, supra*. The judge's consciousness of guilt instruction did not amount to an abuse of discretion. See *Commonwealth* v. *Simmons*, 419 Mass. 426, 434 (1995).

4. *Improper argument*. Both defendants argue that certain remarks made by the prosecutor in his opening statement and closing summation constituted improper argument, violative of their due process rights to a fair trial.

a. *Opening statements*. Both Tran and Tham challenge the propriety of the following remark, made during the prosecutor's opening statement as an inflammatory appeal to sympathy, and not based on evidence that could, or would, be proved at trial: "What [Bud Farnsworth] heard was the mass execution of five men. One of the worst and most violent days in the history of Boston."

While it is improper for a prosecutor to inflame the jury to evoke an emotional, rather than intellectual response, see *Commonwealth* v. *Vuthy Seng*, 436 Mass. 537, 555-556 (2002), cert. denied, 537 U.S. 942, *S.C.*, 454 Mass. 490 (2010); *Commonwealth* v. *Kent K.*, 427 Mass. 754, 759 (1998), "[w]here a charge of murder in the first degree is based on the theory of extreme atrocity or cruelty . . . the jurors serve as the conscience of the community in determining whether the killing merits that description." *Commonwealth* v. *Torres*, 437 Mass. 460, 465 (2002). See *Commonwealth* v. *Johnson*, 429 Mass. 745, 749 (1999) (description of crime as "bloody massacre" not improper). Here, the Commonwealth charged the defendants on a theory of extreme atrocity or cruelty, and the prosecutor permissibly attempted to illustrate the magnitude of the crime. Moreover, the statement "falls into the category of 'enthusiastic rhetoric, strong advocacy, and excusable hyperbole,' and is not grounds for reversal."[24] *Commonwealth* v. *Silva*, 455 Mass. 503, 515 (2009), quoting *Commonwealth* v. *Wilson*, 427 Mass. 336, 350 (1998).

It is further argued that the prosecutor impermissibly vouched

[24]Tham complains of two other statements in the prosecutor's opening: "It is a story that has continued for some fifteen years in two continents . . . . That final chapter will be written by you, the fair and impartial members of this jury"; and "[Lee] cried for help praying that somebody would hear him. Those prayers were answered by Bud Farnsworth . . . ." These statements,

for the credibility of Lee as a witness, *Commonwealth* v. *Croken*, 432 Mass. 266, 267-268 (2000), with the following remark: "Pak Wing Lee . . . was able to talk to the police before his surgery . . . and on subsequent days after the surgery . . . Pak Wing Lee told the police what happened that morning." This was not vouching. The prosecutor could have reasonably expected that Lee would testify to his recollection of "what happened that morning," and make reference to his hospitalization and police visits, when allowable. See *Commonwealth* v. *Hoilett*, 430 Mass. 369, 372 (1999) (opening is to outline general nature of case that counsel expects to prove).

b. *Closing argument.* The defendants argue that the prosecutor, in his closing argument, improperly vouched for the credibility of the two percipient witnesses and argued facts not in evidence. The first statement complained of was not an isolated remark, but was repeated as a theme. The following iteration is illustrative:

> "When you're somebody like Pak Wing Lee and you've got a front row seat to a massacre; in fact, you're gonna be a participant, in the sense that you're gonna be a victim, and you survive, there's one of two things you do. You either tell the truth, or you keep your mouth shut, i.e., Yu Man Young."

Neither defendant objected to these statements at trial, and we review the issue for a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Cosme*, 410 Mass. 746, 750 (1991). "Where credibility is at issue, it is certainly proper for counsel to argue from the evidence why a witness should be believed." *Commonwealth* v. *Thomas*, 401 Mass. 109, 116 (1987). Here, Lee cooperated with police immediately, while Young resisted for years. After they both were vigorously impeached during cross-examination, the prosecutor offered an explanation for why the two witnesses behaved disparately in the aftermath of the shootings. The statement had support in evidence, if inferably so, and more importantly "was grounded in common

too, are properly classified as "excusable hyperbole" or flourishes of justifiable rhetoric. *Commonwealth* v. *Silva*, 455 Mass. 503, 515 (2009).

Tran also argues that the statement in the prosecutor's closing, "[f]ive men were executed like animals," was similarly inflammatory. Again, this lands on the "excusable" rhetoric side of the line. See *id.*

sense, not expertise." *Commonwealth* v. *Oliveira*, 431 Mass. 609, 613 (2000).

Tham also argues that the prosecutor improperly bolstered the credibility of Special Agent Tamuleviz, who testified that Tham made an inculpatory statement to him in English on the trip from San Francisco to Boston, when he said in closing that, based on Tran's apparent ability to speak English and the fact that Tham had lived in Boston for a number of years, he (Tham) would have had the ability to speak English.

Tham objected at trial, and we review for prejudicial error. *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994). While attorneys may marshal evidence with a certain degree of latitude, they may not inject personal opinion into their argument. See *Commonwealth* v. *Simpson*, 434 Mass. 570, 585 (2001); *Commonwealth* v. *Masello*, 428 Mass. 446, 452 (1998). Whether the suggestion to the jury that Tham spoke English was a supportable inference or not, improper statements, even those ascribing an unsubstantiated state of mind to a witness, might not be unduly prejudicial if the judge gives adequate curative instructions to the jury. *Id.* See *Commonwealth* v. *Santiago*, 425 Mass. 491, 500 (1997), *S.C.*, 427 Mass. 298, and 428 Mass. 39, cert. denied, 525 U.S. 1003 (1998). Cf. *Commonwealth* v. *Shelley*, 374 Mass. 466, 470-471 (1978), *S.C.*, 381 Mass. 340 (1980). In this case, the judge instructed the jury: "The personal beliefs of counsel, on any issue in the case or on what the evidence is[,] are not evidence." With specific reference to Tham's objection to the assertion that he spoke English, the judge instructed the jury that Tran's statement, and any inferences it created, "is admissible only as to [Tran] and may not be used by you, in any manner, with regard to your consideration of charges against Mr. Tham." The judge's sound instructions cured whatever prejudice existed, if any. See *Commonwealth* v. *Masello, supra* at 452-453.

5. *Tran's statement to police.* On Friday evening, December 21, 2001, Boston police arrested Tran and Tham upon arrival at Logan Airport. They were taken to a police station and booked at about 11 P.M. Sergeant Detective Robert Harrington with the Boston police homicide unit administered warnings pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 475 (1966) (*Miranda*), through two interpreters fluent in the Cantonese dialect of Chinese, and made available by the FBI. Harrington did not

attempt to interview either defendant that night because they
appeared to be suffering from the effects of "jet lag" after their
long flight from Hong Kong.

At about noon on the following day, Harrington, another
detective, and Carey Chin, a Cantonese-speaking Boston police
officer, interviewed Tran in a "lieutenant's office" on the second
floor of the station. Prior to the interview, the officers allowed
Tran to telephone his sister. The entire interview was tape re-
corded. Tran was not handcuffed.

Tran was given a form, written entirely in Cantonese, explain-
ing his Miranda rights. After Tran read the form to himself,
Harrington read it aloud in English, and Chin, at times some-
what imprecisely, translated aloud into Cantonese. Tran twice
indicated that he understood his rights, and that he was willing
to speak to the officers without an attorney present. He signed
and dated the Cantonese-language Miranda waiver form.

At the time, the Boston police department did not provide a
similar Cantonese-language form explaining a suspect's right to
prompt arraignment, which, within its ambit, includes a rule of
"automatic exclusion" of statements made more than six hours
after arrest, and before arraignment. *Commonwealth* v. *Rosario*,
422 Mass. 48, 55-57 & n.4 (1996) (*Rosario*). See Mass. R.
Crim. P. 7 (a) (1), as amended, 397 Mass. 1226 (1986). Chin,
who was not a certified interpreter and had no formal training,
had difficulty translating, as Harrington read from an English-
language *Rosario* warning form.[25] The relevant portion of the
administration of the warning reads:[26]

> HARRINGTON: "[H]e must understand that no statement that
> he makes six hours or more after his arrest will be accepted

[25]An interrogation of Tham earlier in the morning (which was not admitted
in evidence at the trial) was beset by even more confusion due to many trans-
lation errors. Ultimately, the motion judge suppressed statements Tham made
to police because the police did not scrupulously honor his unambiguous
request for an attorney in violation of *Edwards* v. *Arizona*, 451 U.S. 477, 487
(1981).

[26]Chin's Cantonese translations to Tran, and Tran's actual responses in
Cantonese, were translated into English by a language specialist working for
the FBI. The jury were given a transcript with these certified translations, and
also heard an audio recording. Where Chin's translation departed from the
certified translation on the transcript, the judge instructed the jury to follow
the certified translation.

> by the court unless he waives his right to a prompt arraign-
> ment."
>
> CHIN (translating): "He said it's been six hours since your
> arrest, you have the rights to say anything you want or say
> nothing. . . . The court can . . . okay? Do you under-
> stand?"

After this exchange, Tran began speaking to the officers. Tran
filed a motion to suppress his statements on grounds that he did
not voluntarily and intelligently relinquish his Miranda rights
and his rights under *Rosario*, and that his confession was made
involuntarily. The motion was denied by a judge (not the trial
judge) after a hearing and written findings of fact.

a. *Voluntariness of Tran's Miranda waiver and statement.* As
to both issues, Tran makes three arguments. The first argument
Tran makes is cultural. He argues that, as an immigrant, he had
no experience with the criminal justice system. Because he was
accustomed to a more repressive society, where police torture
was commonplace, he was inclined to be submissive to authority.
The second argument Tran makes is linguistic. He argues that he
is Vietnamese, not Chinese, and he could not effectively com-
municate in Cantonese, especially with an inexperienced inter-
preter and flawed interpretation. The third argument Tran makes
is atmospheric. He argues that his will was overborne after being
confronted in a police-dominated setting (three-to-one), when
already exhausted by a twenty-hour flight from Hong Kong and a
night in a holding cell. Moreover, the interpreter repeatedly inter-
rupted him, demanding that he "speak louder," and pressured
him to "say" that he understood.

i. Miranda *waiver.* A defendant's waiver of his Miranda rights
is only valid if made voluntarily, knowingly, and intelligently.
*Commonwealth* v. *Edwards*, 420 Mass. 666, 670 (1995). Police
must recite Miranda warnings in a language, and in a manner,
an unlettered and unlearned defendant can understand. See
*Commonwealth* v. *Vuthy Seng*, 436 Mass. 537, 544 (2002). "[T]he
use of a card containing the Miranda warnings [is] sufficient to
advise a defendant of his rights, if it appears that the defendant
has read the card and indicates an understanding of what he has
read." *Commonwealth* v. *Perez*, 411 Mass. 249, 255 (1991).

Concerning the Miranda warnings, we are in accord with the motion judge, who found that Tran read and plainly understood the Cantonese language form and, moreover, that Chin "properly translated" the warnings. These conclusions are supported by the evidence adduced at the hearing on the motion to suppress. *Commonwealth* v. *Benoit*, 389 Mass. 411, 419 (1983) (we grant substantial deference to judge's conclusions and subsidiary findings). Nor was there any evidence that Tran, in any manner, was coerced into waiving his Miranda rights.

ii. *Voluntariness of statement.* Additionally, due process requires a separate inquiry into the voluntariness of a defendant's incriminating statements. *Commonwealth* v. *Edwards, supra* at 673. "A judicial determination of voluntariness involves an assessment of 'the totality of relevant circumstances to ensure that the defendant's confession was a free and voluntary act and was not the product of inquisitorial activity which had overborne his will.' " *Commonwealth* v. *Allen*, 395 Mass. 448, 454-455 (1985), quoting *Commonwealth* v. *Mahnke*, 368 Mass. 662, 680 (1975), cert. denied, 425 U.S. 959 (1976). By contrast, a statement is voluntary when it was "the product of a 'rational intellect' and a 'free will.' " *Commonwealth* v. *Edwards, supra,* quoting *Commonwealth* v. *Selby*, 420 Mass. 656, 662 (1995). We may consider, among others, the defendant's age, education, intelligence, physical and mental stability, and experience with the criminal justice system. *Commonwealth* v. *Mandile*, 397 Mass. 410, 413 (1986).

Again, we concur with the motion judge, who concluded that Tran's responses were not coerced but, rather, "indicated a comprehension of the questions, were logical responses, and reflected an effort to exonerate himself." Tran's argument regarding linguistic barriers based on his Vietnamese heritage and Chin's imperfect translation is belied by his answers as memorialized in the recorded statement. His responses are cogent, lucid, and, as the motion judge concluded, logically calculated responses. Moreover, the setting of the interview was a "well appointed" office, where officers removed his handcuffs and afforded him time to telephone his sister. He was given an opportunity to sleep following the international flight, and the recording evinces that the officers' tone and conduct were benign. Tran's will was not overborne, and there was no error in the motion judge's ruling that he voluntarily provided his statement to police.

b. Rosario *waiver.* The motion judge ruled that, although Chin's provision of the warning required by *Rosario* was inadequate for Tran to "fully understand the procedural rights that American justice systems provide," Tran's intelligent waiver of his Miranda rights effectively operated as a waiver of his rights under *Rosario* as well.[27]

Tran argues that he made his statement to police more than twelve hours after arrest, and he did not provide an informed and voluntary waiver where Chin's translation was so demonstrably inaccurate. Therefore, he claims, the motion judge erred by not enforcing the rule of automatic exclusion announced in *Rosario*, *supra* at 56-57, and suppressing his statement. Because Tran preserved his objection for appeal, and because the error he claims is not one of constitutional dimension, we must analyze whether Tran's statement, if improperly admitted, constituted prejudicial error. See *id.*; *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994).

Police are required to bring an arrested individual before a court for arraignment as soon as is reasonably possible. See Mass. R. Crim. P. 7 (a) (1). In *Rosario*, *supra* at 56, this court announced a bright-line rule creating a safe harbor for the interrogation of arrested individuals prior to arraignment: "An otherwise admissible statement is not to be excluded on the ground of unreasonable delay in arraignment, if the statement is made within six hours of the arrest . . . ." Conversely, unless the defendant makes "an informed and voluntary . . . waiver of his right to be arraigned without unreasonable delay," a statement taken outside of the six-hour period is inadmissible. *Id.*

The prevailing purposes of this exclusionary rule are "to prevent unlawful detention and to eliminate the opportunity and incentive for application of improper police pressure" prior to attachment of the constitutional right to counsel at arraignment. *Id.* at 51. See *Commonwealth* v. *Morganti*, 455 Mass. 388, 399 400 (2009). Therefore, we provided for the possibility that the six-hour period could be tolled in exceptional but appropriate

---

[27]The motion judge reasoned: "Given that the defendant already expressed his willingness to waive his Miranda rights, what else, from his perspective, was he being asked to waive? . . . [W]here the defendant could not have been brought before court until Monday at the earliest, the only rights the defendant was really being asked to waive were his Miranda rights."

circumstances. "If, when arrested, the person is incapacitated because of a self-induced disability, such as by the consumption of drugs . . . [or] for reasons not attributable to the police, such as a natural disaster or emergency, interrogation during the six-hour period is not possible or must be suspended, the six-hour period should be tolled appropriately." *Rosario, supra* at 56-57.

As a threshold matter, it was error for the motion judge to conflate the effects of the waivers. See *id.* The two warnings are separate and distinct, as are the rights provided thereunder. See *Miranda, supra*; *Rosario, supra.* Examining the waivers does not involve identical inquiries where weekend court closure renders prompt arraignment an impossibility. We have made clear that *Rosario*'s rule of exclusion was a prophylaxis against dilatory police conduct, and was to be applied notwithstanding police compliance with *Miranda* after expiration of the six-hour safe-harbor period. *Commonwealth* v. *Butler*, 423 Mass. 517, 523 (1996), citing *Rosario, supra* at 51 (recognizing "the coercive nature of a lengthy interrogation, [the rule] provides the court with an additional assurance [over and above the assurance supplied by compliance with the requirements of *Miranda, supra,*] that statements made . . . are free, intelligent, and voluntary"). We have further stated that the rule was intended to standardize the treatment of all suspects, regardless of whether they were arrested while court was in session or not. *Rosario, supra* at 54 ("It is unreasonable to have a rule that permits interrogation when the court is not in session but bars interrogation when the court is in session").

It is not in dispute that Tran's statement occurred more than six hours after his formal arrest at Logan Airport the night before, and we should not be detained by the question whether Tran voluntarily and intelligently waived his *Rosario* rights. Chin's translation fell measurably below what would be required to impart the substantive meaning of the right, and therefore, Tran's waiver was plainly defective. *Id.* at 56-57.

The question becomes whether the type of exceptional circumstances contemplated in *Rosario, supra* at 57, operated to appropriately toll the six-hour period in this case.[28] After providing some guidance, *id.* at 56-57, we have had virtually no

___

[28]Our exclusionary rule for confessions made six hours after arrest, but

occasion to elaborate on what kind of circumstances may justify tolling the six-hour safe-harbor period. See *Commonwealth* v. *Morganti, supra* at 400 (even though "letter" of *Rosario* rule did not apply to suspect awaiting rendition, statements made day after arrest in California to Massachusetts State trooper did not violate "spirit" of rule). That said, we are of the view that the circumstances of Tran's arrest were sufficiently exceptional to toll the running of the six-hour period until the following morning. See *Rosario, supra.* While not strictly a "natural disaster or emergency," there were exceptional circumstances at play here, "not attributable to the police," that rendered it extremely impractical, if not impossible, to conduct an interrogation within six hours of arrest. *Id.* at 57.

It can only be described as the rarest of occasions that police would arrest a defendant at 11 P.M. on a Friday night on arrival at the airport after a long overseas flight from Asia that included uninterrupted layovers in San Francisco and Washington, D.C. Due process considerations would properly require that the police refrain from interrogating a defendant, in custody, whose will might be overborne by his exhaustion or incapacity at that late hour, and at the end of such an extended journey. The delay in interrogation was proper in the circumstances.[29] It was also not "attributable to the police" that Federal law enforcement agencies negotiating the complicated details of an international

---

before arraignment, is a minority position. See *Commonwealth* v. *Perez*, 577 Pa. 360, 367-368 (2004). Most other jurisdictions have held that arraignment delay is a factor to be considered among others in determining the admissibility of a confession. See Annot., Admissibility of Confession or Other Statement Made by Defendant as Affected by Delay in Arraignment, 28 A.L.R. 4th 1121 (1984 & Supp. 2011). See, e.g., *Commonwealth* v. *Perez, supra.* See also *People* v. *Thompson*, 27 Cal. 3d 303, 329 (1980) (delay treated as only one factor to be considered in determining voluntariness); *People* v. *Cipriano*, 431 Mich. 315, 334 (1988) (test is "whether the totality of the circumstances surrounding the making of the confession indicates that it was freely and voluntarily made"); *People* v. *Hopkins*, 58 N.Y.2d 1079, 1081 (1983) (delay in arraignment "but a factor" to consider on underlying voluntariness).

[29]By ruling as we do, we in no way indorse a practice of tolling the six-hour window established in *Commonwealth* v. *Rosario*, 422 Mass. 48 (1996), when individuals are arrested, in the ordinary course, late at night, and court is not in session the following day. It is the fair and inescapable inference that the *Rosario* court was well aware that its rule would necessitate late-hour interrogations where an individual is formally arrested in the evening or early morning. See *Commonwealth* v. *Martinez*, 458 Mass. 684, 694-696 (2011).

prisoner transfer and extradition arranged for Tran to arrive in Boston late on a Friday evening when he could not be arraigned until court was in session the following Monday. See *id.*

Moreover, the police conduct in this case does not evince any measure of the principal mischief that the *Rosario* rule was adopted to prevent, namely, the coercive influence of intentional delays of arraignment to prolong custodial interrogation of unwilling and uncounseled arrestees. *Id.* See *Commonwealth* v. *Perez,* 577 Pa. 360, 367-368 (2004), citing *Commonwealth* v. *Duncan,* 514 Pa. 395, 405 (1987) (overruling Pennsylvania's comparable six-hour rule of exclusion in favor of totality of circumstances test, inter alia, examining whether confession product of police coercion). In short, conducting an interview with a tired and bewildered arrestee, after midnight, was far likelier to bear coercive results than the alternative. See *Rosario, supra* at 51; *Commonwealth* v. *Perez, supra.*

Our rule in *Rosario* was prophylactic in nature, and in affording a narrow window of exception to its application, we acknowledged that courts would confront unusual circumstances, such as this, where flexibility was required. See *id.* Here, where Tran was interrogated the morning after an unusually long sequence of international travel, and his statement to police concluded at 1:20 P.M., very likely within six hours of awakening, our holding does not offend the spirit of *Rosario.* See *Commonwealth* v. *Morganti, supra.*

6. *Review pursuant to G. L. c. 278, § 33E.* We have reviewed the briefs, the entire record, all the issues, and the arguments of counsel. We see no reason to exercise our powers under G. L. c. 278, § 33E, to reduce the degree of guilt on the murder convictions or order a new trial.

*Judgments affirmed.*