NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-10932


COMMONWEALTH  vs.  KENTEL MYRONE WEAVER.


Suffolk.     January 12, 2016. - July 20, 2016.

Present:  Gants, C.J., Spina, Cordy, Duffly, & Lenk, JJ.


Homicide.  Firearms.  Constitutional Law, Admissions and
    confessions, Voluntariness of statement, Waiver of
    constitutional rights by juvenile, Assistance of counsel,
    Public trial.  Evidence, Admissions and confessions,
    Voluntariness of statement.  Practice, Criminal, Capital
    case, Admissions and confessions, Voluntariness of
    statement, Waiver, Assistance of counsel, Public trial,
    Motion to suppress, New trial.



Indictments found and returned in the Superior Court
Department on December 5, 2003.

A pretrial motion to suppress evidence was heard by
Geraldine S. Hines, J.; the cases were tried before Stephen E.
Neel, J.; and a motion for a new trial, filed on June 1, 2011,
was heard by Geraldine S. Hines, J., and Jeffrey A. Locke, J.


Ruth Greenberg for the defendant.
John P. Zanini, Assistant District Attorney, for the
Commonwealth.


CORDY, J.  On the evening of August 10, 2003, fifteen year

old Germaine Rucker was shot and killed. The defendant, who was

sixteen at the time of the shooting, subsequently admitted to committing the murder after prolonged questioning by the police and by his mother.

Prior to trial, the defendant filed a motion to suppress his statements to the police. That motion was denied following an evidentiary hearing. In 2006, a jury convicted the defendant of murder in the first degree on the theory of deliberate premeditation. He was also convicted of the unlicensed possession of a firearm. In 2011, the defendant filed a motion for a new trial under Mass. R. Crim. P. 30, as appearing in 435 Mass. 1501 (2001), claiming that he was denied the effective assistance of counsel in two respects: first, that counsel failed to adequately investigate the defendant's claim that his statements to police were coerced because counsel did not consult with a mental health expert or present expert testimony about the voluntariness of those statements; second, that counsel failed to object to the closure of the court room during jury empanelment in violation of the defendant's right to a public trial under the Sixth Amendment to the United States Constitution. The motion was bifurcated, and different judges considered, and ultimately rejected, the claims. The denial of the motion was consolidated with the defendant's direct appeal.

In his appeal, the defendant asks us to expand our rule requiring the corroboration of extrajudicial statements as it

applies to juvenile confessions pursuant to our extraordinary power under G. L. c. 278, § 33E.  He also claims error in (1) the denial of his motion to suppress; (2) the denial of his motion for a new trial; and (3) the denial of his motion for a directed verdict on the firearms charge.  We affirm the defendant's convictions and decline to grant relief under G. L. c. 278, § 33E.

1.  Facts.  We recite the facts in the light most favorable to the Commonwealth, reserving certain details for our analysis of the legal issues raised on appeal.

On August 10, 2003, the victim went to Wendover Street to sell some small jewelry charms to a woman and her children.  After the transaction, the woman reentered her home, and the daughter remained outside.  The woman heard two gunshots.  She stepped back out of the doorway and saw the victim lying in the street on top of his bicycle.  The bag in which he had carried the jewelry was gone.  The woman went back inside and telephoned 911.

The daughter testified that, just before the shooting, she noticed a group of males of varying ages gathered at the top of Dudley and Wendover Streets.  The group rushed toward the victim, who threw his bag on the ground.  They began to fight.  An older member of the group, who appeared to be about thirty years of age and was wearing a straw hat, threw the first punch.

A younger member of the group, who appeared to be about fifteen years of age and was wearing jean shorts and a white "doo-rag", picked up the victim's bag and ran toward Dudley Street. The daughter ran up the steps toward her front door and heard two gunshots fired in quick succession.

A third witness, who lived on nearby Humphreys Street, was sitting outside on his second-floor porch when he heard gunshots from the direction of Wendover Street. He then saw a young black man run down Humphreys Street away from Dudley Street. The young man wore dark jeans and was trying to pull off a dark shirt, under which he wore a white t-shirt. The young man stumbled and hopped and pulled a pistol from his pants leg. The pistol had a flat handle and a round silver barrel. As he did so, the baseball cap he was wearing fell off of his head. The cap was collected by the police later that evening.

The cap was a Detroit Tigers baseball cap, with a stitched white "D" on the front and what appeared to be hand-drawn or painted white "D" letters on the sides. The police had seen the defendant wearing a cap matching the same description when they spoke to him approximately two weeks before the victim was murdered. Deoxyribonucleic acid (DNA) matching the defendant's DNA profile was found on the hatband. An analyst testified that the possible contributors to the DNA profile found on the

hatband were one in 40 billion Caucasians, one in 1.6 billion African-Americans, and one in 65 billion Southeastern Hispanics.

A ballistics expert testified that shell fragments recovered from the victim were consistent with having been fired from a revolver and not a semiautomatic weapon. A revolver has a round barrel, consistent with the description of the handgun in the possession of the fleeing suspect, and does not eject shell casings. No shell casings were recovered from Wendover Street.

When emergency medical services arrived at the scene, the victim showed no signs of life. He had a bleeding head wound with brain matter visible and a second wound to his lower right back. The medical examiner who performed the autopsy on the victim determined that the cause of death was the two gunshot wounds.

At trial, there was a great deal of testimony regarding the investigation leading up to the incriminating statements that the defendant made to police, especially his admission, made after discussing the particulars with his mother, that he "shot the [victim]." The defense strategy was to claim that the defendant's statements were involuntary, and the result of coercion by a combination of lengthy questioning first by police and then by his mother, Iris Weaver (Weaver). We leave the details concerning the questioning of the defendant and the

resultant incriminating statements to the discussion of the defendant's motion for a new trial, infra, as the trial testimony of the involved police officers and the defendant's mother, viewed in the light most favorable to the Commonwealth, are substantively identical to the testimony given at the evidentiary hearing on the motion.

At the conclusion of the trial, a humane practice instruction was given to the jury. The judge instructed the jury that the Commonwealth bore the burden of proving beyond a reasonable doubt that the defendant made his statement to the police "voluntarily, freely, and rationally." The judge further stated:

> "In order for a statement of a defendant to be voluntary, it must not, in any way, be coerced by physical intimidation or psychological pressure. Under the law of the Commonwealth of Massachusetts, a statement may be coerced not only by law enforcement officials but also by a private citizen. That is, coercion -- You may find that the defendant was coerced. Let me put it this way, coercion may occur not only by law enforcement officials, but in order to be coercion, it may also be caused by a private citizen. A statement made by a defendant is not voluntary if it is psychologically coerced. Therefore, if you find that the statement made by the defendant was coerced by his mother or any other person, you may not consider that statement in reaching a verdict."

During deliberations, the jury asked for a legal definition of "psychological coercion." After receiving the question, the court adjourned for the day. Neither the judge nor counsel located any case law defining the term before court reconvened

the next morning.  The judge then repeated his original instructions to the jury, adding that the jurors should "give the term psychological coercion its plain and ordinary meaning as you understand it.  But I will tell you that psychological coercion refers to inappropriate or inordinate psychological pressure."  The jury subsequently convicted the defendant.

2. Discussion.  a.  Corroboration rule.  In Commonwealth v. Forde, 392 Mass. 453, 458 (1984), we announced the corroboration rule, which "requires corroboration that the underlying crime was in fact committed, thus preventing convictions against persons who have confessed to fictitious crimes."  Commonwealth v. DiGiambattista, 442 Mass. 423, 430 (2004), citing Forde, supra at 458.  In DiGiambattista, we declined to expand the rule to require corroboration that a defendant was the actual perpetrator of the crime, or to require a showing that a confession is reliable under the circumstances in which it was given.  DiGiambattista, supra at 431-432.  Acknowledging the phenomenon of false confessions, we concluded that the problem is best addressed through the "strict analysis of the circumstances of [an] interrogation as they affect the voluntariness of a defendant's statement."  Id. at 432.

On appeal, the defendant asks us to reconsider expanding the corroboration rule as it applies to juvenile confessions in light of research that juveniles are more likely than adults to

confess to crimes they did not commit -- research to which no citation is provided. He argues that his case illustrates the need for an expanded rule requiring additional evidence that the accused perpetrated the crime because although there is no question that a crime occurred -- satisfying Forde -- there is no evidence, aside from the defendant's confession, linking him to it.

We decline to expand the rule on this record. The defendant fails to articulate why our practice of rigorously examining the voluntariness of a defendant's confession is an inadequate prophylactic measure against the use of false confessions in securing a conviction. Indeed, even if we were to expand the rule, it would not aid the defendant's case. In addition to the defendant's admission, the Commonwealth presented evidence at trial linking the defendant to the murder, including testimony that (1) a young man was seen fleeing from the scene of the shooting; (2) the young man had a firearm fitting the description of a revolver in his possession as he fled; (3) the young man was wearing a distinctive baseball cap, which fell to the ground; (4) the cap belonged to the defendant; and (5) the victim and the defendant were known to each other.

The defendant also asks for unspecified relief under G. L. c. 278, § 33E, on the basis that the jury could not properly assess the voluntariness of his admission in this case. We

disagree, as the jury heard extensive evidence about the circumstances surrounding the defendant's statements, and were properly instructed on the humane practice rule.  We therefore decline to grant relief under § 33E.

b.  <u>Motion to suppress the defendant's statements</u>.  The defendant next asserts error in the denial of his pretrial motion to suppress his statements to the police based on his claim that they were involuntary and coerced.  The Commonwealth argues that the defendant waived this argument by failing to brief the issue in accordance with Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975).[1]  In his brief, the defendant does not dispute the factual findings of the judge who heard the motion (pretrial motion judge) as to the credibility of witnesses, but the defendant states that he "does dispute the conclusions of law."  The defendant then states that he incorporates by reference the authorities cited in the defendant's application to a single justice in the county court for leave to prosecute an interlocutory appeal "in the interests of judicial economy and brevity."  The defendant additionally cites to authorities apparently not cited in the prior filings,

---

[1] Rule 16 (a) (4) of the Massachusetts Rules of Appellate Procedure, as amended, 367 Mass. 921 (1975), requires that the appellant's argument "contain the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes and parts of the record relied on. . . . The appellate court need not pass upon questions or issues not argued in the brief."

but does not provide complete citations or any argument as to why those authorities undermine the rulings of the pretrial motion judge.

We agree with the Commonwealth that the defendant's treatment of this issue in his brief does not rise to the level of appellate argument required by rule 16 (a) (4) and is therefore technically waived.[2] However, review under G. L. c. 278, § 33E, requires us "to consider all issues apparent from the record, whether preserved or not." Commonwealth v. Randolph, 438 Mass. 290, 294 (2002). Thus, we review the denial of the motion to suppress, and if there was error, we determine whether the error created a substantial likelihood of a miscarriage of justice in the verdict. Id.

"In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of his ultimate findings and conclusions of law.'" Commonwealth v. Scott, 440 Mass. 642, 646 (2004), quoting Commonwealth v. Jimenez, 438 Mass. 213, 218 (2002).

Following an evidentiary hearing, the pretrial motion judge found the following facts that we conclude are supported by the

---

[2] In his reply brief and at oral argument, the defendant argued it was not his intention to waive this claim, but rather incorporated the authority contained in the trial pleadings in the interest of "judicial economy." This contention is unavailing.

evidence.  In investigating the victim's murder, the detectives initially brought the defendant's older brother, Cassim, to the police station for questioning because they had received information that he had been seen wearing a blue Detroit Tigers baseball cap, similar to the one found near the scene of the shooting.  Apparently satisfied that Cassim was not involved in the shooting, he was subsequently dropped off at home by a police officer after the interview.  Weaver was upset that Cassim had been taken to the police station.

After speaking with Cassim, the focus of the investigation shifted to the defendant.  O'Leary went to the Weaver residence, apologized for bringing Cassim to the police station, and told Weaver that he wanted to speak to the defendant about the victim's murder.  Weaver knew the victim and was aware of the shooting.  Weaver told the police that the defendant was away at camp and that he would be returning on Sunday, August 24. Weaver and O'Leary agreed that they would meet, with the defendant present, on Monday, August 25.

In the time between speaking with Weaver and the anticipated interview with the defendant, O'Leary learned that the Boston police had arrested the defendant on a drug offense on July 26, 2003.  The booking sheet generated after that arrest indicated that the defendant was wearing a Detroit Tigers

baseball cap.  This baseball cap closely resembled the baseball cap found near the scene of the victim's shooting.

At approximately 8:30 P.M. on August 25, O'Leary returned to the Weaver home with another detective to meet with the defendant.  Although Weaver was cordial and respectful, the presence of the detectives in her home caused her to feel very uncomfortable.  Weaver had not had any previous contact with the police and she was still upset and concerned about the detectives conducting the interview with Cassim.  She invited the detectives to sit at the dining room table where she and the defendant joined them.  At some point during the conversation, Weaver left the table to continue cooking dinner in the adjoining kitchen.  The apartment had an open floor plan and the view from the dining room table to the kitchen was unobstructed.

Before the detectives began questioning the defendant, O'Leary produced a waiver form that contained a printed version of the Miranda warnings especially for juveniles.  Upon seeing the form, Weaver asked if it was necessary to give her son the Miranda warnings.  O'Leary told her that it was "routine" and then explained that because his purpose was to question the defendant about the victim's shooting, the defendant should be advised of his Miranda rights before any questioning took place. O'Leary first asked the defendant to complete the part of the form containing his personal information.  The defendant did so

at his mother's direction.  O'Leary read each of the rights from the form and then asked Weaver and the defendant if they understood them.  He also asked them to initial the form after each warning to indicate that the rights had been explained to them.  The pretrial motion judge concluded that Weaver, though not highly educated, is an intelligent woman and understood those rights.

Weaver noticed that the defendant was becoming "aggravated and frustrated" as the rights were being explained.  She told him to relax and breathe while encouraging him to sign the form. She and the defendant verbally acknowledged that they understood the rights being explained and initialed the form as requested. Weaver never explained her understanding of these rights to the defendant.

After Weaver and the defendant signed the form, O'Leary told Weaver that she could speak with her son privately.  They went to the area near the stairs, away from where they had been sitting.  After a few minutes, they returned to the dining room. O'Leary stated that if they understood the rights and if they agreed to speak with them, the defendant should sign the part of the form that acknowledged that he had taken advantage of the opportunity to speak with his mother outside the presence of the police officers.  The defendant and his mother signed the form.

The detectives then questioned the defendant about the victim's shooting for about three hours. Weaver occasionally left the table to continue cooking dinner but remained within earshot of the interview at all times. The defendant denied that he was in the area of Wendover Street on the night of the shooting, that he was associated with any of the individuals named by the police, or that he knew about a fight involving the victim and other youths who had accused the victim of stealing a bicycle.

The detectives asked more difficult questions that left no doubt that they suspected the defendant of having been involved in the shooting. The defendant was unaware that the detectives had information that the defendant had fallen from his bicycle the night of the shooting. O'Leary asked the defendant how (not if) the defendant had hurt his leg; the defendant said that he had injured it playing basketball. Signaling his disbelief, O'Leary asked the defendant if it was possible that he had injured himself by falling off his bicycle the night of the shooting. The defendant denied this, and said whoever said that was lying. When pressed about when the basketball injury occurred, the defendant was unable to specify the date. Weaver volunteered that they had gone to church on August 10 and that the defendant was not limping at that time. After consulting a calendar and reviewing the events of the weeks passed, the

defendant said that his injury occurred two days after the shooting.

The detectives then questioned the defendant about his Detroit Tigers baseball cap. The defendant admitted to wearing such a cap when he was arrested on July 26. He also agreed that the cap was distinctive on account of the airbrushed letter "D" on either side of the logo. The defendant said that he had taken the cap to an establishment in downtown Boston to have the distinctive markings placed on it. When asked where the cap was, the defendant stated that it was lost or stolen the same day that he hurt his leg playing basketball. When pressed on the date, the defendant stood by his statement that it was lost on August 12.

O'Leary then told the defendant that a witness had observed a black male matching the defendant's description running from the scene of the shooting and losing a baseball cap that had been recovered by the police. He said that if the defendant was not wearing the cap it must have been Cassim. The defendant denied that Cassim was at the scene. O'Leary expressed his confidence that the defendant was present on Wendover Street on August 10 and was involved in the shooting. The interrogation was terminated shortly thereafter. O'Leary told the defendant that he "needed to know the truth" and that the investigation

would continue.  O'Leary told Weaver that he did not believe the defendant's story.

Although he made no promises of leniency, O'Leary urged Weaver to "sit down and talk with [the defendant]," "have a heart to heart talk," and "try to figure out" his role in the events of the shooting.  O'Leary did not suggest questions to Weaver, but he suspected that the defendant was involved and was hoping for whatever information Weaver could provide to assist in the investigation.

The pretrial motion judge found that neither Weaver nor the defendant asked the detectives to leave their home, nor did they ever request an attorney or seek in any way to terminate the interview.  The defendant's demeanor during the questioning was sober and coherent, except for when he seemed to be agitated that the same questions were being asked repeatedly.  The defendant did not appear to be under the influence of drugs or alcohol, incapacitated, or incompetent.  Although the detective suspected that the defendant was involved in the shooting, he did not have an arrest warrant and Weaver was free to terminate the questioning at any time.

After the detectives left, Weaver began questioning her son.  She was upset that the detectives had come to her home and was concerned with some of the defendant's answers to their questions.  She was particularly concerned that the defendant's

baseball cap may have been found at the scene of the shooting and she wanted answers from him.  The pretrial motion judge found that she was as much concerned with her own need to clarify her son's involvement in a very serious crime as she was with the detective's request that she speak with the defendant. In her own words, she "wanted to have some peace with this thing."  She asked the defendant the same questions that she had heard the detectives asking and did not believe the defendant's answers.  After about an hour, she stopped questioning the defendant, and then sat in a chair for most of the night thinking about what had just happened.

O'Leary telephoned Weaver the next morning while she was at work to ask if she had had the "heart to heart" talk with the defendant.  Weaver told him that she had not, but would when she got home from work.  She did not tell O'Leary about her conversation with the defendant from the night before.

Because she was distracted by the events of the previous evening, Weaver decided to leave work early and arrived home around 10 A.M.  She decided to talk with the defendant again because she "didn't have peace with this thing in my mind." After about an hour she stopped questioning him because the questions and answers gave her a headache.  About one-half hour later, she called the defendant back to resume her questioning. She brought God into the conversation, and told the defendant

that a boy had died and that such a thing could not be a secret between children, that God knew about it, and that the defendant would have no life at all if he did not tell what he knew about the killing.  She continued to question him on and off until the late afternoon.  In an effort to get the defendant to tell the truth, she resorted to pounding her fist on the kitchen table and gritting her teeth.  The pretrial motion judge found that in seeking the truth about the defendant's involvement in the shooting, Weaver was motivated by a desire to do the right thing in accordance with her personal spiritual beliefs and was not acting as an agent of the police.

Weaver then prayed again and told the defendant she would ask him two questions.  She asked if he was in the area when the shooting occurred; the defendant said, "Yes."  She then asked if he did it or if he knew who did it.  The defendant put his head down but said nothing; Weaver took this gesture to mean "Yes." Weaver, who the pretrial motion judge found to be a woman of sincere and deeply held religious convictions, began to cry and to pray out loud.  The defendant's sister came into the house and joined her mother in prayer.  Having realized the defendant may have been involved in a murder, Weaver insisted that the defendant had to confess for the good of his soul.

The pretrial motion judge found that the concern and love that Weaver felt for her son expressed itself at this point in

her singular focus on his spiritual rather than his legal well-being.  She did not give the defendant any advice or counsel that would have made him aware of the need to avail himself of the constitutional protections to which he was entitled.  She did not tell the defendant to remain silent but rather advised him to tell the truth to the police.  She did not seek legal assistance for her son.

At approximately 4 P.M., Weaver tried to contact O'Leary. He called her back at around 8 P.M. and she told him that she was bringing the defendant to speak with him.  O'Leary replied that he assumed the defendant was involved and Weaver said, "Yes."

In the midst of the talk about God and surrender as the way to salvation, the defendant told his mother that he did not want to go to the police station.  In the end, however, he succumbed to his mother's entreaties that he confess for the good of his soul and turn himself in to the police.  Weaver formulated a plan that they would go to the police station, that he would say, "I shot Germaine Rucker," and the detectives would then take him into custody.  He was to say nothing more until a lawyer was appointed to represent him.  Sometime after midnight on August 27, the Weaver family concluded their prayer session and left their home to go to the police station which was a short distance away.  On the way, they prayed out loud.  When

they arrived at the station, at approximately 12:30 A.M., they stood together in a circle, praying for the defendant. The defendant was crying. They waited for O'Leary and the other detective to arrive. No police officer had requested that the defendant be brought to the police station.

When the detectives arrived, Weaver told O'Leary that the defendant had something to say to them, that she expected them to take him into custody after his statement and that she wanted him to have an attorney before they questioned him any further. Realizing that the defendant was about to make an inculpatory statement, O'Leary indicated that he would not take any statement until the defendant was represented by counsel. However, he did not tell the defendant to remain silent until they could arrange for an attorney. At the same time, O'Leary produced a juvenile Miranda form from his briefcase and began reciting the warnings to the defendant. As he did so and before he could finish reading the rights, the defendant said, "I shot Germaine Rucker." O'Leary then arrested the defendant and read him his rights. Until the defendant made the statements, he was free to leave the station.

i. August 25 statements. The defendant first argues that the statements made in his home on August 25, 2003, should have been suppressed because he did not validly waive his Miranda rights before speaking with the police and because his

statements were not voluntary.  Rejecting these contentions, the pretrial motion judge concluded that the Miranda warnings were not required and that the defendant's statements were voluntarily made.  We agree.

A.  Custodial interrogation.  Miranda warnings are required only when a defendant is subjected to a custodial interrogation, and "a defendant's failure to receive or understand Miranda warnings, or police failure to honor Miranda rights, does not result in suppression of a voluntary statement made in a noncustodial setting" (citation omitted).  Commonwealth v. Libby, 472 Mass. 37, 40 (2015).  Whether an interrogation is custodial depends on the "objective circumstances of the interrogation, and not on the subjective views of either the interrogating officers or the person being questioned."  Commonwealth v. Sneed, 440 Mass. 216, 220 (2003).  This inquiry focuses on whether a reasonable person in the defendant's position would believe that his freedom of movement was restricted to the degree associated with formal arrest.  Commonwealth v. Morse, 427 Mass. 117, 123 (1998).  In determining whether a defendant was in custody, the court considers "(1) the place of the interrogation; (2) whether the police conveyed any belief or opinion that the person being questioned was a suspect; (3) whether the questioning is aggressive or informal; and (4) whether the suspect was free to

end the interview by leaving the place of interrogation, or whether the interview ended with the defendant's arrest." Commonwealth v. Murphy, 442 Mass. 485, 493 (2004).

We agree with the pretrial motion judge's findings that the environment in which the defendant was questioned was not inherently coercive because it occurred in the defendant's home, on a date and time of his convenience, and in his mother's presence. See Commonwealth v. Conkey, 430 Mass. 139, 144 (1999), S.C., 443 Mass. 60 (2004) (interrogation not custodial where defendant allowed police into home to question him). Although the detectives informed the defendant that they believed he was involved in the crime being investigated, they did not coerce or threaten the defendant during the interview, and the defendant and his mother were free to terminate the interview at any time.

We appreciate that Weaver, and not the defendant, invited the detectives into their home and permitted them to conduct the interview. Nonetheless, we agree with the pretrial motion judge that a reasonable person in the defendant's position would not have viewed his questioning as coercive or believed that his freedom of movement was curtailed to the degree of arrest. Accordingly, the Miranda warnings were not required in connection with the August 25 interrogation.

B.  Interested adult.  We also agree with the pretrial motion judge's conclusion that, even if Miranda warnings were required, there is no merit to the defendant's argument that his waiver was invalid because he was not afforded the special protections due to juveniles.  "Investigating officials permissibly may interview a juvenile suspected of a crime, and a statement that is the product of that interview, if knowing and voluntary, may be admitted at trial against the juvenile."  Commonwealth v. Philip S., 414 Mass. 804, 808 (1993).  However, the Commonwealth bears a heavy burden of demonstrating that a defendant knowingly and intelligently waived his privilege against self-incrimination.  Commonwealth v. Berry, 410 Mass. 31, 34 (1991), S.C., 420 Mass. 95 (1995)  Where a defendant is a juvenile, the court proceeds with "special caution when reviewing purported waivers of constitutional rights" (quotation omitted).  Id.  Where a juvenile is at least fourteen years of age, the Commonwealth must demonstrate that prior to waiving his rights, he was given the opportunity to consult with an interested adult who was informed of, and understood, those rights.  Id. at 35.

In his motion to suppress, the defendant argued that his mother was not an "interested adult" because she did not understand the Miranda warnings and because she felt compelled to sign the waiver to have the defendant sign the waiver.  The

defendant also denied having the opportunity to consult with her.

In determining whether an adult is an interested adult, "the facts must be viewed from the perspective of the officials conducting the interview." Philip S., 414 Mass. at 809. The court examines whether, at the time of the investigation, "it should have been reasonably apparent to the officials questioning a juvenile that the adult who was present on his or her behalf lacked capacity to appreciate the juvenile's situation and to give advice, or was actually antagonistic toward the juvenile." Id. If such facts are present, the court is warranted in finding that the juvenile was not assisted by an interested adult and was not afforded the opportunity for consultation. Id.

Here, the pretrial motion judge explicitly found that Weaver understood the Miranda warnings, and we see no grounds to disturb this finding. To the extent that the testimony of Weaver and that of the detectives differed on this point, we note that credibility determinations "are the province of the motion judge." Commonwealth v. Johnson, 461 Mass. 44, 48 (2011). Moreover, viewing the circumstances from the perspective of the officers, it appeared that Weaver was an intelligent, responsible adult who cared for her son and was concerned for his welfare. Additionally, the record reflects

that Weaver understood why the police were questioning her son, and she remained present or within listening distance throughout the interview.  Nor was there any apparent animosity between the defendant and Weaver.

The judge also found that Weaver and the defendant had had a private consultation prior to signing the form and waiving their rights.  Even if Weaver and the defendant did not speak during this time, we note that "[i]t is not necessary for such a juvenile actually to consult with the interested adult, for it is the opportunity to consult that is critical."  Berry, 410 Mass. at 35.

Additionally, the motion judge correctly found that Weaver was an interested adult despite encouraging the defendant to speak with the detectives and to tell the truth.  "We reject the notion that a parent who fails to tell a child not to speak to interviewing officials, who advises the child to tell the truth, or who fails to seek legal assistance immediately is a disinterested parent."  Philip S., 414 Mass. at 810.  See Commonwealth v. Quint Q., 84 Mass. App. Ct. 507, 517 (2013) (mother who advised son to be truthful with police was interested adult despite giving advice that would not have comported with that of lawyer).  In other words, an interested adult is not a proxy for a lawyer.  Accordingly, we conclude

that the defendant was afforded the protections of the interested adult rule.

C. Valid waiver. Even assuming the Miranda warnings were required, we conclude the defendant's waiver of his Miranda rights was valid. In determining whether a waiver is knowing and voluntary, the court examines the totality of the circumstances surrounding the waiver. See Commonwealth v. Mazariego, 474 Mass. 42, 52-53 (2016). Factors relevant to this inquiry include "promises or other inducements, conduct of the defendant, the defendant's age, education, intelligence and emotional stability, experience with and in the criminal justice system, physical and mental condition, the initiator of the discussion of a deal or leniency . . . and the details of the interrogation, including the recitation of Miranda warnings" (citation omitted). Commonwealth v. Walker, 466 Mass. 268, 274 (2013).

The facts support the pretrial motion judge's conclusion that the defendant's waiver was knowing and voluntary. The defendant and his mother were provided with Miranda warnings, which both understood. The interrogation took place in the defendant's home and in the presence of his mother. The record did not show that the defendant's will was overborne by his mother's directions to sign the form. Although the interview lasted some time, the questioning was generally nonaggressive

and the police did not make any threats or promises to the defendant. The defendant was young, but was of average intelligence and had had at least one prior experience with the police. His responses to questions were coherent, and there was no evidence that he was under the influence of alcohol or other substances. Nor did the defendant present any evidence that his mental state was otherwise compromised. The defendant also made several statements aimed at exculpating himself, including stating that he was not at the scene of the shooting and providing an explanation for the injury to his leg. See Commonwealth v. Vazquez, 387 Mass. 96, 100 (1982) (exculpatory statements tend to show defendant's statements are voluntary).

D. Voluntariness. Due process requires a separate inquiry into the voluntariness of a defendant's inculpatory statements. Commonwealth v. Siny Van Tran, 460 Mass. 535, 559 (2011). "A voluntary statement is one that is the product of a rational intellect and a free will, and not induced by physical or psychological coercion" (citation and quotations omitted). Commonwealth v. Monroe, 472 Mass. 461, 468 (2015). The court examines the totality of the circumstances to determine whether the defendant's statements were the product of free will and rational intellect and "not the product of inquisitorial activity which had overborne his will" (citation omitted). Siny Van Tran, supra at 559. Relevant factors include "the

defendant's age, education, intelligence, physical and mental stability, and experience with the criminal justice system." Id. Applying these factors to the circumstances, we conclude that the defendant's waiver was knowing and voluntary for largely the same reasons set forth above. Additionally, although the defendant expressed frustration with the questioning, the record does not show that he was agitated or emotionally overwrought. Cf. Monroe, 472 Mass. at 470-471 (statements coerced where defendant demonstrated disturbed emotional state, was threatened by police and was crying, and was subjected to hostile interview). Given these circumstances, the pretrial motion judge did not err in concluding that the defendant's statements on August 25, 2003, were voluntary, and not the product of physical or psychological coercion.

ii. August 27 statement. The defendant also argues that the motion judge erred in denying his motion to suppress his statement at the police station, "I shot Germaine Rucker," because it was obtained in violation of his Miranda rights and was involuntary. As the pretrial motion judge correctly concluded, the Miranda warnings were not required because the defendant's statement was not the product of interrogation or its functional equivalent by the police. See Commonwealth v. Gonzalez, 465 Mass. 672, 675 (2013) ("term 'functional equivalent' includes 'any words or actions on the part of the

police [other than those normally attendant to arrest and custody] that the police should know are reasonably likely to elicit an incriminating response from the suspect'" [citation omitted]). Here, the detective was reciting the Miranda warnings when the defendant made his statement. Although the detectives anticipated that the defendant would make a statement and were therefore providing the Miranda warnings, the statement was not made because of words or actions by the detectives meant to elicit it.

A. Agent of the police. The defendant also argues that his statement should have been suppressed because his mother acted as an agent of the police when she brought him to the police station to make the statement. A private party is considered a State agent when government officials prompt the party to act or participate with the party in an action which they themselves could not have legally engaged. Commonwealth v. Jung, 420 Mass. 675, 686 (1995). An individual is not a State agent if no promises are made in exchange for the individual's help and if nothing was offered or asked of that individual. Commonwealth v. Reynolds, 429 Mass. 388, 393 (1999), quoting Commonwealth v. Harmon, 410 Mass. 425, 428 (1991). Here, the detectives urged Weaver to have a heart to heart conversation with her son to determine whether he participated in the shooting, and although he followed up on this request with a

telephone call to Weaver, he did not otherwise make any threats or promises to obtain her assistance. Additionally, the detectives do not appear to have been trying to gain information through Weaver that they could not otherwise legally obtain themselves, especially where the defendant voluntarily submitted to questioning about the shooting. Moreover, the pretrial motion judge's finding that Weaver aggressively questioned the defendant out of her desire to do what was right in accordance with her personal spiritual beliefs undercuts the defendant's argument. See Commonwealth v. Foxworth, 473 Mass. 149, 158 (2015); Reynolds, 429 Mass. at 393 (individual who has not entered into agreement with government or who reports incriminating evidence to police out of conscience not acting as government agent [quotation and citation omitted]). We therefore reject the defendant's contention that Weaver was acting as an agent of the police in encouraging the defendant's confession.

B. Voluntariness. We lastly consider the defendant's argument that his statement at the police station was involuntary and the product of coercion by his mother. "[U]nder the law of this Commonwealth, a judge must determine the voluntariness of statements extracted by private coercion, unalloyed with any official government involvement" (quotation and citation omitted). Commonwealth v. Paszko, 391 Mass. 164,

176-177 (1984).  "[A] statement obtained through coercion and introduced at trial is every bit as offensive to civilized standards of adjudication when the coercion flows from private hands as when official depredations elicit a confession" (citation omitted).  Commonwealth v. Allen, 395 Mass. 448, 455 (1985).  Accordingly, our inquiry is governed by the same analysis delineated above regarding the voluntariness of the defendant's August 25 statements.

The defendant argues that his mother coerced his August 27 confession by relentlessly questioning him for two days about his involvement in the shooting, by demanding that he tell the truth, and by making him feel guilty by praying and invoking God and the need to "be at peace," and by forcing him to travel to the police station to confess.  It is well-settled that a defendant may offer evidence that a relative's involvement in questioning about a crime is coercive.  See Commonwealth v. McCra, 427 Mass. 564, 569 (1998); Commonwealth v. Adams, 416 Mass. 55, 60-61 (1993).  The pretrial motion judge concluded that although Weaver's exhortations played a major role in the defendant's decision to confess, the circumstances of the confession did not evidence that the defendant's will was overborne to the extent that he lost his ability to make an independent decision.  Cf. Commonwealth v. Burgess, 434 Mass. 307, 314 (2001) (police may "broadly" suggest that it would be

best for suspect to tell truth); Commonwealth v. Cunningham, 405 Mass. 646, 658 (1989) (defendant's statement, prompted by urging of police and priest that it would be best to tell truth, not psychologically coerced where defendant made voluntary decision to make statement, in part to unburden troubled conscience); Philip S., 414 Mass. at 813 (court declined to consider requests that juvenile tell truth as coercive practice).

We agree with the pretrial motion judge's findings that the defendant was not physically or psychologically coerced by his mother and her religious beliefs such that he could not resist her pleas that he tell the truth. The defendant and his family prayed at the police station, and the defendant cried, but he was not otherwise overwrought such that his statement was not the product of free will and a rational intellect. Moreover, the defendant does not argue that his mother's efforts to get him to confess were an improper appeal to his religious beliefs. In fact, the record does not demonstrate whether the defendant held the same beliefs as his mother. Cf. United States v. Miller, 984 F.2d 1028, 1032 (9th Cir.), cert. denied, 510 U.S. 893 1993); Mersereau v. State, 286 P.3d 97, 115 (Wyo. 2012) (court considered whether appeal to suspect's religious beliefs was unduly coercive). Nor did his mother, in invoking God, indicate that the defendant would be treated more leniently if he confessed. We thus conclude that Weaver's questioning of the

defendant did not rise to the level of improper psychological coercion that would render his statement involuntary, and the defendant's confession on August 27 was a free and voluntary act.

Accordingly, we conclude that the judge did not err in denying the defendant's pretrial motion to suppress on the various grounds asserted by the defendant.

3. <u>Ineffective assistance of counsel</u>. a. <u>Mental health expert</u>. The defendant argues that the judge who heard one portion of his motion for a new trial (first new trial motion judge)[3] erroneously denied that portion of the motion, which was based on the failure of the defendant's trial counsel to investigate the defense of psychological coercion adequately by not consulting with a mental health expert or presenting expert testimony about the voluntariness of the defendant's confession at either the suppression hearing or at trial.[4] The defendant also contends that the first new trial motion judge erred

---

[3] In his motion for a new trial, the defendant asserted two bases for ineffective assistance of counsel. Because the trial judge had retired, the issues were bifurcated and decided by judges other than the trial judge.

[4] The defendant initially argued that trial counsel should have consulted with an expert and presented expert testimony on the existence and etiology of false confessions, in addition to expert testimony on the issue of voluntariness. On appeal, the defendant abandons this argument and acknowledges we have not yet ruled such evidence admissible. <u>Commonwealth</u> v. <u>Hoose</u>, 467 Mass. 395, 419 (2014).

because he failed to distinguish between testimony concerning the voluntariness of a statement and the phenomenon of false confessions. We conclude that the motion was properly denied, although for reasons different than those stated by the judge.

In a written memorandum of decision and order issued after three days of evidentiary hearings, the first new trial motion judge made the following findings of fact.[5] The defendant's trial counsel is a very experienced and highly regarded defense attorney. He has practiced law for over forty years and handled over one hundred murder trials at the trial and appellate level. Because the defendant was sixteen years of age, trial counsel spent a great deal of time speaking with the defendant's mother about the circumstances surrounding the defendant's statements to her, and formulated the defense that the police used Weaver as their agent to induce the defendant to admit his involvement in the homicide. Trial counsel moved to suppress the defendant's August 27, 2003, statement to the police on that

---

[5] Because the judge who heard this portion of the defendant's motion for a new trial (first new trial motion judge) drew facts about the murder, investigation, and defendant's admission from those found by the judge had who presided over the defendant's pretrial motion to suppress, we do not repeat them here. Insofar as relevant here, the first new trial motion judge based his additional findings on the affidavits and testimony of the defendant's trial counsel and Dr. Frank DiCataldo, a psychologist whom the defendant had retained, as well as the affidavits of the defendant and his mother, Weaver. The affidavits submitted by the defendant and Weaver reiterated that the defendant's statements were not the product of his free will, but rather were coerced by Weaver.

ground, as well as on the ground that Weaver failed to act as an interested adult for her son by impermissibly pressuring him to confess to the police.

Trial counsel testified that he prepared a defense by learning the facts of a case and then, starting from scratch, researching the law as it related to the issues presented. The judge found that at the time trial counsel litigated the motion to suppress and tried the case, he had researched but was not aware of any appellate or trial court decisions permitting expert testimony on claimed coerced or false confessions.[6] According to trial counsel, there was no strategic reason not to consult with or present an expert on psychological coercion, and that given the nature of the defense, it would not have harmed the defense to do so.

In connection with the motion for a new trial, Dr. Frank DiCataldo, a forensic psychologist, examined the defendant and testified at the evidentiary hearing. DiCataldo did not find any evidence that the defendant suffered from any significant cognitive limitations and did not detect any signs of mental illness. After administering two psychological tests,

---

[6] The first new trial motion judge noted that trial counsel had defended one case where a codefendant's request to present expert testimony on coerced and false confessions was denied because it failed to satisfy the standards of expert testimony, and that the ruling was affirmed on appeal. See Commonwealth v. Robinson, 449 Mass. 1, 5-7 (2007). Trial counsel acknowledged he would have been aware of the decision.

interviewing the defendant, and gaining an understanding of the defendant's family dynamics, DiCataldo opined that by virtue of a protracted investigation by his mother, the defendant's admissions were not the product of his own free will or rational intellect. DiCataldo acknowledged that the basis for his opinion was limited because he had never evaluated a voluntariness claim where the asserted coercive force was a parent, or where the statement was made ten years prior to the evaluation. DiCataldo also acknowledged that neither of the tests he administered to the defendant was specifically focused on juveniles and that there are no specific psychological tests to determine whether a person's will has been overborne.

Applying the standard set forth in Commonwealth v. Saferian, 366 Mass. 89, 96 (1974), the first new trial motion judge denied the defendant's motion. In doing so, he rejected the defendant's claim that trial counsel was ineffective for failing to consult with an expert witness. The judge found that it was more likely than not that trial counsel was aware of the absence of Massachusetts case law permitting expert testimony on the psychology of coerced and false confessions, and did not consult an expert because it would not have added value to the defense.

The judge further concluded that the defendant failed to satisfy the prejudice prong of a Saferian analysis because he

could not demonstrate, as a threshold matter, that DiCataldo's testimony would have been admissible under the foundational requirements of Mass. G. Evid. § 702(b) (2016). Additionally, the judge found that the parent-child dynamic is so generally familiar to a fact finder that expert testimony was not required to further illuminate the issue for a jury. Moreover, the psychological influences of a parent on her child are categorically different from those of other authority figures, such as the police. Thus, the judge found, DiCataldo's reliance on scientific research involving the impact of psychologically coercive or manipulative techniques by police to obtain a statement do not provide a basis for his opinion that, in this case, the defendant was coerced by his mother's conduct. The judge concluded that because DiCataldo's proffered testimony was inadmissible under § 702(b), trial counsel's failure, either to consult an expert or attempt to present expert testimony, could not have prejudiced the defendant's case.

Where a defendant has been convicted of murder in the first degree, the court evaluates a claim of infective assistance claim to determine whether "there exists a substantial likelihood of a miscarriage of justice," Commonwealth v. Williams, 453 Mass. 203, 204 (2009). The court asks "[1] whether there was an error in the course of trial (by defense counsel, the prosecutor, or the judge), and, [2] if there was,

whether that error was likely to have influenced the jury's conclusion" (citation omitted).  Commonwealth v. Lang, 473 Mass. 1, 19 (2015) (Lenk, J., concurring).  This standard is more favorable than the constitutional standard for determining ineffectiveness of counsel.  Commonwealth v. Gonzalez, 443 Mass. 799, 808 (2005).  The court considers the defendant's claim "even if the action by trial counsel does not constitute conduct 'falling measurably below that . . . of an ordinary fallible lawyer'" (citation omitted).  Id. at 808-809.

Where a defendant challenges tactical or strategic decisions by trial counsel, the court will find ineffective assistance "only if such a decision was manifestly unreasonable when made."  Commonwealth v. Diaz, 448 Mass. 286, 288 (2007).  However, the "manifestly unreasonable standard" only applies "where the attorney's purportedly constitutionally ineffective conduct involved a strategic decision, rather than some other claimed inadequacy such as a lack of appropriate investigation or preparation by defense counsel."  Lang, 473 Mass. at 20 (Lenk, J., concurring), citing Commonwealth v. Martin, 427 Mass. 816, 822 (1998).

In Lang, trial counsel was aware of the defendant's psychiatric history but chose to pursue another defense without investigating a criminal responsibility defense.  Lang, 473 Mass. at 11-12 (Hines, J., concurring).  A majority of justices

concurred that the "manifestly unreasonable standard" did not apply in these circumstances because "strategic choices made after less than complete investigation are reasonable [only] to the extent that reasonable professional judgments support the limitation on investigation."  Id. at 19 (Lenk, J., concurring), quoting Commonwealth v. Baker, 440 Mass. 519, 529 (2003).  Although Lang and the cases cited therein relate to the adequacy of an investigation into a lack of criminal responsibility defense, these cases provide a useful framework for evaluating the defendant's claim.

Here, the first new trial motion judge found that there was no evidence showing that trial counsel's failure to consult with a mental health expert was a lapse rather than a reasoned decision.  This finding was confined to trial counsel's investigation into case law permitting expert testimony on psychological coercion as it related to false confessions and did not address trial counsel's strategy with respect to expert testimony about voluntariness.  We therefore assume without deciding that trial counsel's failure to consult with a mental health expert was not a strategic or tactical decision and thus manifestly unreasonable.  Accordingly, we ask only whether the failure to consult a mental health expert or to present expert testimony at trial as to the voluntariness of the defendant's statements "was likely to have influenced the jury's

conclusion."  Commonwealth v. Wright, 411 Mass. 678, 682 (1992),

S.C., 469 Mass. 447 (2014).

In order to carry his burden of demonstrating that the

expert consultation and testimony would have accomplished

something material for the defense, Commonwealth v. Bell, 460

Mass. 294, 303 (2011), the defendant, as a threshold matter,

must demonstrate that DiCataldo's testimony would have been

admissible.  The first new trial motion judge correctly

concluded that DiCataldo's testimony regarding a child's

susceptibility to parental coercion generally, or the

defendant's susceptibility to coercion by his mother would not

have been admissible.

Section 702 of the Massachusetts Guide to Evidence

governing the admission of expert testimony provides:

> "A witness who is qualified as an expert by
> knowledge, skill, experience, training, or education
> may testify in the form of an opinion or otherwise if
>
> "(a) the expert's scientific, technical, or other
> specialized knowledge will help the trier of fact to
> understand the evidence or to determine a fact in
> issue;
>
> "(b) the testimony is based on sufficient facts
> or data;
>
> "(c) the testimony is the product of reliable
> principles and methods; and
>
> "(d) the expert has reliably applied the
> principles and methods to the facts of the case."

Mass. G. Evid. § 702 (2016).

DiCataldo's evaluation of the defendant was based on his assessment of the defendant through the administration of psychological tests and information provided by the defendant and his mother.  The first new trial motion judge noted that the facts relied on by DiCataldo were substantially different from those presented at the hearing on the motion to suppress and found by the pretrial motion judge.  Additionally, DiCataldo created his own methodology for forming an opinion about the voluntariness of the defendant's statement because he was not aware of any peer-reviewed or generally accepted methodology within the psychological community that would apply to the circumstances in this case.

We have explained that "expert testimony is sufficiently reliable if the underlying theory or methodology is either (1) generally accepted in the relevant scientific community; . . . or (2) satisfies the alternative requirements adopted in [Commonwealth v. Lanigan, 419 Mass. 15, 24-26 (1994)]" (citation omitted).  Commonwealth v. Shanley, 455 Mass. 752, 761-762, (2010).  The defendant claims that he demonstrated the admissibility of DiCataldo's testimony by establishing general acceptance in the psychological community.  We disagree.

First, the defendant relies on the false logic that because DiCataldo has rendered his expert opinion in other cases in the

Commonwealth, his opinion was admissible in this case. We reject this unsubstantiated statement. The defendant does not point to a single case where DiCataldo testified about the coercion of a child by a parent.

The defendant further argues that the first new trial motion judge erred in ruling that DiCataldo's testimony was inadmissible because the courts of the Commonwealth have long recognized that a defendant is entitled to present expert testimony by a mental health expert regarding the voluntariness of a statement, and that trial counsel should have sought expert testimony in light of this precedent, and that such testimony is admissible. The defendant cites to several cases to illustrate this point. Notably, in each of these cases, the proffered expert testimony related to a mental impairment that called into question the voluntariness of the defendant's statements. See, e.g., Commonwealth v. Boyarsky, 452 Mass. 700, 713 (2008) (panic disorder); Commonwealth v. Crawford, 429 Mass. 60, 67 (1999), overruled on another ground by Commonwealth v. Carlino, 449 Mass. 71 (2007) (battered woman's syndrome and posttraumatic stress disorder); Commonwealth v. Monico, 396 Mass. 793, 798-799 (1986) (head trauma that impacted voluntariness of statements and raised question of criminal responsibility); Commonwealth v. Daniels, 366 Mass. 601, 608 (1975) (intellectual disability); Commonwealth v. Harrison, 342 Mass. 279, 289, 293 (1961) (head

trauma, mental illness, personality disorder, "defective intelligence," psychosis); Commonwealth v. Banuchi, 335 Mass. 649, 655-656 (1957) (effect of sudden deprivation of alcohol on mental capacity of confirmed alcoholic).

The defendant argues that in rejecting DiCataldo's testimony as inadmissible, the first new trial motion judge concluded that "psychology as a science was incapable of yielding reliable admissible evidence probative of a statement's voluntariness." Such an assertion is unfounded.  Rather, our case law demonstrates that when expert testimony as to a novel or developing area of science is offered, the court carefully considers whether it is "sufficiently reliable to reach the trier of fact."  Shanley, 455 Mass. at 761.  See, e.g., Commonwealth v. Hoose, 467 Mass. 395, 419 (2014); Crawford, 429 Mass. at 67.

In addition to determining the reliability of an expert's proffered testimony, "[t]he judge must also determine whether the reasoning or methodology can be applied to the facts in issue -- that is, whether there is a proper 'fit' between the two."  Shanley, 455 Mass. at 761 n.13.  Here, DiCataldo, in addition to employing a one of a kind methodology to evaluate the defendant, relied on research involving the impact of psychologically coercive or manipulative techniques by police to obtain a statement to evaluate whether the defendant had been

coerced by his mother.  Not only is this reasoning a poor "fit,"
but it also depends on expert testimony on false confessions,
which we have not yet ruled admissible.  Hoose, 467 Mass. at
419.

Similarly misplaced is the defendant's reliance on our
decisions in Commonwealth v. Jackson, 471 Mass. 262, 264 n.5
(2015), cert. denied, 136 S. Ct. 1158 (2016), and Adams, 416
Mass. at 61, where expert testimony was admitted to aid the jury
in assessing the voluntariness of a juvenile's statements.  In
Jackson, supra at 264 n.5, the voluntariness of the defendant's
statements to the police was an important issue at trial.  The
defendant called a clinical psychologist to testify "about his
examination of the defendant and his opinion with regard to the
defendant's susceptibility to being influenced by persons in
authority like the police."  Id.

While these facts are superficially similar to the
defendant's case, there are important distinctions to be drawn.
Although the admissibility of the expert testimony was not at
issue in our decision in Jackson, our review of the record
before the court in that case reveals that the defendant was
evaluated by the clinical psychologist because there was a
question of criminal responsibility and competency to stand
trial.  The psychologist conducted a forensic mental health
assessment of the defendant, which included extensive

investigation into the defendant's past as well as interviews and a number of psychological assessment tests of the defendant. He testified that the defendant suffered from attention deficit disorder and dependent personality disorder, and that these conditions made him more susceptible to being influenced by people in positions of authority. The methodology used by the psychologist and its application to the facts in Jackson were profoundly different from those used by DiCataldo. Moreover, the defendant in Jackson, 471 Mass. at 264 n.5, presented evidence that it was his mental health impairments that made him more susceptible to pressure by authority figures. Here, the defendant sought to present evidence that his will was simply overborne by his mother. These inquiries are fundamentally distinct.

Similarly, in Adams, 416 Mass. at 60-61, we held that it was error to exclude testimony from the defendant's mother and a forensic psychiatrist tending to show that the defendant had been coerced into confessing by the presence of his mother. Although we do not know the methodology employed by the psychiatrist in evaluating Adams, it is apparent from the unpublished memorandum and order that the Appeals Court issued pursuant to its rule 1:28 following Adams's retrial that there was a contention that his intellectual abilities or disabilities may have affected the voluntariness of his statement. As

discussed earlier, while we regularly admit expert testimony regarding the voluntariness of a statement where the defendant suffers from a mental impairment or mental health issue, there is no evidence that the defendant here had cognitive limitations or suffers from a mental illness that would affect his capacity to make a voluntary statement.

Finally, we agree with the first new trial motion judge's determination that the parent-child dynamic is generally familiar to a fact finder, and that the likelihood of a child being influenced by a parent is not a matter outside the common understanding of the average juror, nor is the proposition that a parent may exert pressure on his or her child a novel one. Thus, the jury's evaluation of whether the defendant's statements were psychologically coerced by his mother "could be accomplished through its common understanding without need of expert testimony." Commonwealth v. Bly, 448 Mass. 473, 496 (2007).

Our conclusion that DiCataldo's testimony would not have been admissible at trial does not foreclose a defendant from presenting expert testimony regarding coercion and voluntariness. "Determining whether . . . scientific testimony is reliable often will hinge on the presentations made by the parties in a particular case . . . and these determinations may vary appropriately on a case-by-case basis." Canavan's Case,

432 Mass. 304, 312 (2000). In this case, the defendant failed to show that the methodology used by DiCataldo would be generally accepted by the scientific community or was otherwise admissible under the factors articulated in Lanigan. Because the testimony would not have been admissible at the defendant's trial, we cannot conclude that it would have accomplished something material for the defense such that the jury verdict would have been different. Accordingly, the defendant's claim of ineffective assistance must fail.

b. Public trial. The defendant next claims error in the denial of the portion of his motion for a new trial that rested on the ground that his trial counsel was ineffective for failing to object to the closure of the court room during the entirety of jury empanelment.

After an evidentiary hearing, the judge who hear this portion of the motion (second new trial motion judge) issued a written memorandum of decision in which she found the following facts, which are supported by the evidence. Jury selection spanned two days. The approximately ninety venire members made the court room was very crowded. They took every available seat, and those who could not find seats stood wherever they could. On the first day of empanelment, a court officer informed the defendant's mother that she and those accompanying her that the court room was "closed for jury selection." They

were also denied entry the second day of empanelment for the same reason. Trial counsel lodged no objection.

The second new trial motion judge concluded that the sole reason that a court officer closed the court room to the defendant's family and other members of the public was the crowded condition. The judge found that facts surrounding the empanelment did not satisfy the criteria articulated in Waller v. Georgia, 467 U.S. 39, 48 (1984), that may justify a court room closure, but concluded that the closure did not prejudice the defendant's case, and accordingly denied the motion.

A violation of the Sixth Amendment right to a public trial constitutes structural error. See Commonwealth v. Jackson, 471 Mass. 262, 268 (2015), citing United States v. Marcus, 560 U.S. 258, 263 (2010). We agree with the second new motion judge's conclusion that the closure was a full, rather than partial, closure of the court room. See Commonwealth v. Cohen (No. 1), 456 Mass. 94, 111 (2010); Commonwealth v. Lavoie, 80 Mass. App. Ct. 546, 551-552 (2001), S.C., 464 Mass. 83, cert denied, 133 S. Ct. 2356 (2013).

Where a meritorious claim of structural error is timely raised, the court presumes "prejudice, and reversal is automatic." Jackson, 471 Mass. at 268, quoting Commonwealth v. LaChance, 469 Mass. 854, 856 (2014), cert. denied, 136 S. Ct. 317 (2015). However, the right to a public trial can be waived

in some circumstances.  Jackson, supra.  "[W]here the defendant has procedurally waived his Sixth Amendment public trial claim by not raising it at trial, and later raises the claim as one of ineffective assistance of counsel in a collateral attack on his conviction, the defendant is required to show prejudice from counsel's inadequate performance (that is, a substantial risk of a miscarriage of justice) and the presumption of prejudice that would otherwise apply to a preserved claim of structural error does not apply."  LaChance, supra at 856.

The defendant did not raise an objection to the court room closure because his attorney did not understand that the public had a right to be present during the jury empanelment phase of the trial proceedings.  The second new trial motion judge's analysis, which anticipated the rule announced in LaChance, supra, correctly determined that counsel's inaction was the product of "serious incompetency, inefficiency, or inattention to the defendant's Sixth Amendment right to a public trial, and was not objectively reasonable," but that the defendant otherwise failed to show that trial counsel's conduct caused prejudice warranting a new trial.

On appeal, the defendant does not dispute that he failed to demonstrate prejudice, but rather asks us to revise the LaChance rule and instead hold that that a defendant who raises an ineffective assistance of counsel claim and has established

that, in failing to object to a court room closure, counsel's performance fell below that of an ordinary fallible attorney, is entitled to a presumption of prejudice. See LaChance, supra at 860-868 (Duffly, J., dissenting). We decline to do so.

Moreover, the defendant has not advanced any argument or demonstrated any facts that would support a finding that the closure subjected him to a substantial likelihood of a miscarriage of justice. Relief is therefore not warranted under G. L. c. 278, § 33E, and the denial of the motion for a new trial is affirmed.

4. Firearms conviction. The defendant lastly asks the court to vacate his firearms conviction on the grounds that the Commonwealth presented no evidence that he lacked the required firearms licenses, and thus failed to prove beyond a reasonable doubt that he did not have a license to carry. Contrary to the defendant's assertion, lack of license is not an element of unlicensed possession, but rather an affirmative defense. Commonwealth v. Allen, 474 Mass. 162, 174 (2016), and cases cited. Accordingly, the defendant bore the burden of producing evidence that he held a license, and he failed to carry that burden.

5. Review under G. L. c. 278, § 33E. We have reviewed the record in accordance with G. L. c. 278, § 33E, and we discern no basis on which to reduce the verdict of murder in the first

degree or to order a new trial.  The defendant's convictions are affirmed.  Based on the record before us, it appears that the defendant is entitled to the benefit of a corrected mittimus to reflect that his life sentence under G. L. c. 265, § 2 carries with it the opportunity for parole consideration after fifteen years because he was a juvenile at the time of his conviction. See Diatchenko v. District Attorney for the Suffolk Dist., 466 Mass. 655, 673 (2013), S.C., 471 Mass 12 (2015), and Commonwealth v. Brown, 466 Mass. 676, 688-689 (2013), S.C., 474 Mass. 576 (2016).  The matter is accordingly remanded to the Superior Court for further proceedings consistent with this opinion.

So ordered.